**Charles Jess PALMER, Petitioner,**

v.

**Harold W. CLARKE, Director, State of Nebraska Department of Correctional Services, Respondent.**

No. 4:00CV3020.

United States District Court,
D. Nebraska.

Oct. 9, 2003.

Steven E. Achelpohl, Omaha, NE, Michael A. Nelsen, Hillman, Forman Law Firm, Omaha, NE, for Charles Jess Palmer.

J. Kirk Brown, Kimberly A. Klein, Attorney General's Office-Nebraska, Lincoln, NE, for Harold W. Clarke.

Jon C. Bruning, Donald B. Stenberg, Attorney General's Office-Nebraska, Lincoln, NE, for Atty. Gen.

## MEMORANDUM and ORDER

BATAILLON, District Judge.

This matter is before the court on Charles Jess Palmer's third amended petition for a writ of habeas corpus. Filing No. 44. Charles Jess Palmer has been on death row since 1979. He has been convicted of capital felony murder and sentenced to death three times under Nebraska's Death Penalty Statute, Neb.Rev.Stat. § 29-2523.[1] The court has carefully re-

---

1. In *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), the United States Supreme Court struck down Arizona's capital sentencing scheme finding that any factual determination necessary to impose the death penalty must be found by a jury beyond a reasonable doubt. That decision effectively struck down Nebraska's death penalty scheme. In a special session in November 2002, the Nebraska Legislature largely repealed relevant portions of the statute that apply to Palmer's sentence of death. *See* 2002 Laws, Third Spec. Sess., LB 1, § 10 (November 23, 2002). Accordingly, Palmer is to be executed under a state statute that is no longer in force.

viewed the voluminous record in this case and the numerous submissions of the parties at this and earlier levels of the proceedings and now concludes that Charles Jess Palmer has been sentenced to death in violation of the United States Constitution.

## I. Background

### A. First Trial

Palmer was tried and convicted of first degree murder under a felony-murder theory in 1979 for the death of Eugene Zimmerman. The state's case against Palmer in the first trial was based largely on circumstantial evidence. The evidence adduced at Palmer's trial shows that Zimmerman was found murdered in his residence above his coin shop in Grand Island, Nebraska, on March 6, 1979. *State v. Palmer*, 210 Neb. 206, 313 N.W.2d 648, 649 (1981) (*"Palmer I"*). The evidence also shows that before the trial, the victim's wife, Monica Zimmerman, and two other witnesses, Deanna Klintworth and Jim Mracek, had been hypnotized during pretrial interviews to refresh their recollections. *Palmer I, 313 N.W.2d* at 653; Trial I Tr., Vol. VI at 886–887. They all testified that they had seen Palmer in Grand Island at or near the time of the murder. Monica Zimmerman testified that she had seen Palmer and his wife and child in Grand Island on several occasions before the murder. Trial I Tr., Vol. III at 355. She testified that she had first seen Charles and Cherie Palmer at the coin shop in October 1978 and she identified Palmer as the man who had been at Zimmerman's residence and coin shop in late 1978. *Id.* at 345. Deanna Klintworth testified that she had seen a man, a woman,

and a baby exit the Zimmerman house and coin shop at 4:45 p.m. on March 6, 1979. Trial I Tr., Vol. IV at 456–58. Jim Mracek testified that he had seen Zimmerman in the 7–Eleven coffee shop with a man, a woman, and a baby on that day. Trial I Tr., Vol. VI at 886.[2] The testimony of the witnesses that had been refreshed under hypnosis was the only direct evidence that tied Palmer to the murder. Trial I Tr., Vol. III at 371, Vol. IV at 455–456.

The evidence also shows that earlier in the day on March 6, 1979, "C. Palmer" had received a ticket for an equipment violation at a highway checkpoint nine miles south of Hastings, Nebraska, which was midway between Grand Island, Nebraska, and Guide Rock, Nebraska, where Palmer was living at the time of the murder. *Palmer I*, 313 N.W.2d at 651; Trial I Tr., Vol. III at 428. The owners of a dog farm where Palmer had been employed in Guide Rock testified that they last spoke with him on March 18, 1979. *Palmer I*, 313 N.W.2d at 651; Trial I Tr., Vol. III at 299, 303–304, 317. Palmer had arranged for a neighbor to take care of the dogs on March 19, 1979. *Palmer I*, 313 N.W.2d at 651; Trial I Tr., Vol. III at 676–678. The neighbor testified he believed Palmer left Guide Rock on March 19 or 20, 1979. *Palmer I*, 313 N.W.2d at 651; Trial I Tr., Vol. III at 679.

The evidence adduced at the trial further shows that law enforcement authorities were later alerted to Palmer's whereabouts when a coin dealer in Austin, Texas, contacted the police after he purchased several items from Palmer, including items that had been stolen from Zimmerman's coin shop.[3] *Palmer I*, 313

---

**2.** Mracek testified that Charles Palmer was not the man he saw that day. Trial I Tr., Vol. VI at 892. He first identified Cherie Palmer as the woman, but later recanted that testimony. *Id.* at 887, 898.

**3.** Before the trial, Palmer moved to suppress use of the seized items as evidence, including jewelry from Zimmerman's store seized at the time of his arrest. The motion was denied. *Palmer I*, 313 N.W.2d at 651.

N.W.2d at 651–652; Trial I Tr., Vol. IV at 577, 580, 586–587. The police instructed the coin dealer to call them if Palmer were to initiate contact again. *Palmer I*, 313 N.W.2d at 651–652; Trial I Tr., Vol. IV at 589. Palmer later did so and the coin dealer immediately called the police. *Palmer I*, 313 N.W.2d at 651; Trial I Tr., Vol. IV at 579–580. The police officer testified that he did not have time to obtain an arrest warrant in the twenty minutes between the call and the arranged meeting. *Palmer I*, 313 N.W.2d at 652.

The jury returned a guilty verdict. Pursuant to the Nebraska death penalty statute in effect at the time, Neb.Rev.Stat. § 29–2521, a three-judge panel conducted a sentencing hearing. At the sentencing hearing, the prosecutor sought to apply two statutory aggravators under Neb.Rev. Stat. § 29–2523.[4] Trial I Tr., Vol. VIII at 985. The prosecutor argued: (1) that the murder had been "committed in an apparent effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of the crime," under Neb.Rev.

Stat. § 29–2523(1)(b); and (2) that the murder was "especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence" under Neb.Rev.Stat. § 29–2523(1)(d). *Id.* Palmer's counsel conceded the applicability of the "murder to conceal crime" aggravator, stating, "I have no qualms with [the prosecutor's] conclusion with regard to subparagraph 'b.' I think there is obvious evidence in the record that you could justify that." Trial I Tr., Vol. VIII at 988.

A three-judge sentencing panel sentenced Palmer to death, as provided in Neb.Rev.Stat. § 29–2520 (1980). *Nebraska v. Palmer*, No. 30–011, Hall Co. Clerk's Rec. ("St.Ct.File"), Vol. I at 173–83, Order of Sentencing (Aug. 27, 1980). The sentencing panel found that both aggravating factors applied. It found no mitigating circumstances applied and noted that "the defendant in this case has stood mute and offered no evidence of any mitigating circumstance whether or not such mitigating

---

4. Under the statute, aggravating circumstances are:

(1) Aggravating Circumstances:

(a) The offender was previously convicted of another murder or a crime involving the use or threat of violence to the person, or has a substantial prior history of serious assaultive or terrorizing criminal activity;

(b) The murder was committed in an effort to conceal the commission of a crime, or to conceal the identity of the perpetrator of such crime;

(c) The murder was committed for hire, or for pecuniary gain, or the defendant hired another to commit the murder for the defendant;

(d) The murder was especially heinous, atrocious, cruel, or manifested exceptional depravity by ordinary standards of morality and intelligence;

(e) At the time the murder was committed, the offender also committed another murder;

(f) The offender knowingly created a great risk of death to at least several persons;

(g) The victim was a public servant having lawful custody of the offender or another in the lawful performance of his or her official duties and the offender knew or should have known that the victim was a public servant performing his or her official duties;

(h) The murder was committed knowingly to disrupt or hinder the lawful exercise of any governmental function or the enforcement of the laws; or

(i) The victim was a law enforcement officer engaged in the lawful performance of his or her official duties as a law enforcement officer and the offender knew or reasonably should have known that the victim was a law enforcement officer.

The facts upon which the applicability of an aggravating circumstance depends must be proved beyond a reasonable doubt.

Neb.Rev.Stat. § 29–2523.

circumstance was described by the statute."[5] *Id.* at 181.

Palmer's first conviction and sentence were reversed on appeal. *Palmer I,* 313 N.W.2d at 654–55. The Nebraska Supreme Court found the trial court had committed reversible error in admitting the hypnotically-induced testimony of Monica Zimmerman, Deanna Klintworth and Jim Mracek. *Id.* at 653.

## B. Second Trial

Palmer was retried in 1982 and was again convicted. Between the first and second trials, Cherie Palmer, Charles Palmer's wife, had filed for divorce in Texas. The prosecutor sought to use her testimony at the second trial since it would no longer be barred by Nebraska's statutory ban on testimony by a spouse. Trial II Tr., Vol. I at 25–26. He successfully moved for a continuance of the trial once. *Id.* at 50. The divorce was granted in Texas on March 12, 1981, and the prosecutor moved for a second continuance in anticipation of an appeal of the divorce decree. *Id.* at 55; Ex. 1. The trial court overruled the second motion and the case proceeded to trial. *Id.*

The evidence adduced at the second trial again circumstantially linked Palmer to the murder. Importantly, Cherie Palmer's testimony was admitted over an objection

that it violated spousal immunity. *Id.,* Vol. II at 292–93. She testified that she, Charles Palmer, and their child traveled to Grand Island on March 6, 1979, to sell some diamond rings to Zimmerman. *Id.* at 309–11. She went on to testify essentially that Palmer murdered Zimmerman. *Id.* at 312–23. According to Cherie Palmer, Charles Palmer hit Zimmerman and took him upstairs. *Id.* at 314–16. She later heard a thump and a "course sounding voice . . . a chant sort of voice." *Id.* at 320. Cherie Palmer's testimony was thus the strongest evidence that linked Palmer to the murder.[6]

A three-judge panel again sentenced Palmer to death, finding the same two aggravators that were found in the first trial. St. Ct. File, Vol. II at 419–34, Order of Sentence (July 19, 1982).

Palmer's second conviction was also reversed on direct appeal. *State v. Palmer,* 215 Neb. 273, 338 N.W.2d 281 (1983) (*"Palmer II "*). The Nebraska Supreme Court found the trial court's admission of Cherie Palmer's testimony violated the spousal privilege statute. *Id.* at 282, 338 N.W.2d 281. Shortly after *Palmer II* was issued, but before Palmer's third trial, the Nebraska Legislature passed new legislation that limited the application of the spousal privilege. *See* 1983 Neb. Laws,

---

5. The statute also listed mitigating circumstances:

(2) Mitigating Circumstances:

(a) The offender has no significant history of prior criminal activity;

(b) The offender acted under unusual pressures or influences or under the domination of another person;

(c) The crime was committed while the offender was under the influence of extreme mental or emotional disturbance;

(d) The age of the defendant at the time of the crime;

(e) The offender was an accomplice in the crime committed by another person and his or her participation was relatively minor;

(f) The victim was a participant in the defendant's conduct or consented to the act; or

(g) At the time of the crime, the capacity of the defendant to appreciate the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of law was impaired as a result of mental illness, mental defect, or intoxication.

Neb.Rev.Stat. § 29–2523.

6. Deanna Klintworth's testimony was not admitted, and the testimony of Monica Zimmerman and Jim Mracek was limited under the Nebraska Supreme Court's order on remand.

L.B. 696. The statute was amended to provide that the privilege could not be claimed "in any criminal case where the crime charged is a crime of violence." Neb.Rev.Stat. § 27–505(3)(A) (Reissue 1985).

## C. Federal Pretrial Double Jeopardy Challenge

Before his third trial Palmer filed a *pro se* action in federal district court raising an ex post facto and double jeopardy challenge. *See Palmer v. Clarke,* No. 4:84CV144, Filing No. 1, Petition for Habeas Corpus Relief (D.Neb. Feb. 29, 1984) ("Fed.Ct.File"). He contended that both his second trial violated double jeopardy and his impending trial would violate double jeopardy because the evidence, excluding inadmissible evidence, was insufficient to convict him in either the first trial or the second trial. He sought a stay to prevent the state from trying him again because a finding of insufficient evidence would amount to an acquittal and would trigger double jeopardy protections. *Id.* The federal district court first dismissed the claim as premature. *Id.* at Filing No. 2 (D.Neb. March 1, 1984). That dismissal was reversed by the Eighth Circuit in *Palmer v. Drum,* No. 84–8041 (8th Cir. May 10, 1984) (unpublished opinion). *See* Fed. Ct. File at Filing No. 8. The Eighth Circuit remanded the case to district court for reconsideration in light of the Supreme Court's holding in *Justices of Boston Mun. Ct. v. Lydon,* 466 U.S. 294, 104 S.Ct. 1805, 80 L.Ed.2d 311 (1984) (plurality opinion), that exhaustion of a double jeopardy claim does not require a defendant to undergo a second trial. Fed. Ct. File, Filing No. 8 at 2–3. On remand, the district court again dismissed, this time finding the petition meritless and frivolous. *See id.* at Filing No. 14, Memorandum and Order (D.Neb. May 22, 1984) (ruling that the Double Jeopardy Clause is not violated by a retrial after a conviction is reversed for evidentia-ry error rather than for insufficient evidence).

Palmer again appealed to the Eighth Circuit. Meanwhile, because the federal district court had denied Palmer's motion for a stay, *id.* at Filing No. 15, Palmer was tried and convicted for the third time in June 1984. The Eighth Circuit Court of Appeals held the action in abeyance pending resolution of all proceedings in the Nebraska state courts. *See Palmer v. Grammer,* 863 F.2d 588, 590 (8th Cir.1988) ("*Palmer (Fed.) I*"). In 1986, the Nebraska Supreme Court affirmed Palmer's conviction and sentence on Palmer's direct appeal, *State v. Palmer,* 224 Neb. 282, 399 N.W.2d 706 (1986) ("*Palmer III*" or "direct appeal"). The Eighth Circuit then addressed Palmer's double jeopardy challenge. *Palmer (Fed.) I,* 863 F.2d at 590–92. The Eighth Circuit agreed that Palmer's claim, as written, lacked merit, but remanded the case to the district court to allow Palmer to amend his petition. *Id.* at 594. It specifically found that "[a] properly exhausted and nonprocedurally barred claim by Palmer challenging the sufficiency of *all* the evidence in his first or second trial (or both) would constitute a cognizable double jeopardy claim." *Id.*

On remand, Palmer amended his petition and added the allegation that Cherie Palmer's testimony at the second trial should not be considered in determining sufficiency because the testimony had been procured through prosecutorial and judicial misconduct. Fed. Ct. File, Filing No. 22. The district court concluded that the evidence (including the improperly admitted evidence) in the first and second trials was sufficient to support Palmer's first and second convictions. *Id.,* Filing No. 55, Rept. & Rec. of Mag. Judge (D.Neb. May 25, 1990); Filing No. 57, Order Adopting Rept. & Rec. of Mag. Judge (D.Neb. Sept. 17, 1990). The district court did not ad-

dress the prosecutorial misconduct allegations because it found the claim was outside the scope of the remand. *Id.,* Filing No. 46 at 1, Mem. and Order Granting Protective Order (D.Neb. Sept. 11, 1989).

Palmer again appealed and the Eighth Circuit again remanded. *Palmer v. Clarke,* 961 F.2d 771, 774 (8th Cir.1992) (*"Palmer (Fed.) II "*). It found the misconduct claim was an integral part of Palmer's sufficiency argument, noting that evidence obtained through prosecutorial misconduct is an exception to the rule that all evidence must be considered to determine sufficiency. *Id.* at 773. The action was remanded for the district court to consider whether misconduct had occurred. *Id.* The Eighth Circuit expressly determined, in addition, that a later posttrial double jeopardy challenge would not be a second or successive petition. *Id.* at 764.

The federal district court held an evidentiary hearing on February 24, 1993. *See* Fed. Ct. File, Filing No. 87, Tr. of Feb. 24, 1993, Hearing (Hrg. Tr.). Attorney Stephen Von Riesen, who prosecuted Palmer at the second trial, testified that he had tried to determine Cherie Palmer's marital status in order to introduce her testimony in the second Palmer trial. Hrg. Tr. at 19. He had successfully moved to continue the trial once, before the divorce was final. *Id.* at 22, 23. The Palmers' divorce was granted in Texas on May 12, 1982, and Von Riesen had filed for another continuance on May 25, 1982, assuming that an appeal of the divorce decree could prevent Cherie from testifying. *Id.* at 36–37. Von Riesen also testified that he had known Cherie Palmer's testimony would be significant, if not essential, in the absence of Deanna Klintworth's testimony. *Id.* at 43. He also testified that the trial judge had informed, ex parte, before the trial, that Cherie Palmer would be allowed to testify. *Id.* at 49. He also

testified, however, that he had been satisfied that a competent legal argument could be made that Cherie Palmer's testimony was admissible, and that he had not offered her testimony knowing that it would be inadmissible. *Id.* at 60. The district court found that no prosecutorial or judicial misconduct had occurred and that Cherie Palmer's testimony should be considered in determining the sufficiency of the evidence. *See* Fed. Ct. File, Filing Nos. 89 and 97. It further found the evidence sufficient to support the conviction. *Id.,* Filing No. 89 at 12; Filing No. 97 at 6. That decision was ultimately affirmed. *See Palmer v. Clarke,* 12 F.3d 781, 782 (8th Cir.1993) (*"Palmer (Fed.) III "*). Interestingly, the record shows that after the Eighth Circuit remanded the case to district court, the mandate was issued and records were ordered transferred to Hall County, Nebraska, District Court. *See* Fed. Ct. File, Filing No. 108. The case was never dismissed; the file was merely closed.

### D. Third Trial

As noted, Palmer was tried, convicted, and sentenced to death for the third time in 1984. Cherie Palmer again testified and provided the only direct evidence linking Palmer to the murder. She testified that she and her husband and their child went to Zimmerman's coin shop on March 6, 1979, to sell jewelry. Trial III Tr., Vol. II at 477. Charles Palmer hit Zimmerman, knocking him to the floor, and asked him for money. *Id.* Palmer then shoved Zimmerman up the stairs, where the two remained for fifteen minutes. *Id.* at 482. Cherie Palmer went upstairs and observed Zimmerman lying on a bed with his hands and feet tied. *Id.* at 483. Charles Palmer rummaged through drawers looking for jewelry. *Id.* at 484–85. Zimmerman said his stomach hurt. *Id.* at 484. Cherie Palmer offered to get him some medicine

and then gave him some Valium. *Id.* Charles Palmer then told Cherie Palmer to go downstairs. *Id.* at 486. She testified that shortly thereafter "there was a—a lot of thumping noises. Thump, Thump, Thump, Thump, and some kind of a—a guttural noise. I kept hearing a—a low, monotonous, almost a chant—like sound. A very deep and very throaty guttural type, over and over, again." *Id.* Cherie Palmer further testified that Charles Palmer came back downstairs after about fifteen minutes and then Charles, Cherie, and the child left the house. *Id.* Cherie testified that she told Palmer, "Charlie, Mr. Zimmerman knows who we are." *Id.* at 490. Cherie also testified that they had been to see Mr. Zimmerman on about five previous occasions and that she had entered into a plea bargain and had spent 18 months in jail. *Id.* at 513.

Dr. Pierce T. Sloss, a pathologist, testified that he conducted a postmortem examination on Eugene Zimmerman's body. *Id.* at 575. Dr. Sloss first "observed tightly encircled about the neck of the decedent an electrical cord." *Id.* at 576. He testified that his examination of Zimmerman's body revealed that

> the voice box and the windpipe immediately below where the cord, electrical cord had been encircled around the neck were broken and bleeding had taken place into these broken structures and about these broken structures. A large amount of blood had been entrapped in the blood vessels of the head above the level of the encircling cord.

*Id.* at 577. He also observed that "the face contained multiple bruises and several broad scratches and a fresh cut" and "there was a fresh bruise just below the left collar bone." *Id.* He opined that "death was due to strangulation and that death occurred approximately at 4:30 on the afternoon of the 6th day of March, 1979." *Id.* He further noted that there was no postmortem evidence that the victim's hands had been bound and that there were no stomach contents consistent with medication to be given within a half hour of death. *Id.* at 578–9. Monica Zimmerman's testimony identified Charles Palmer as the man who had attempted to sell coins and jewelry at their store on previous occasions. *Id.* at 453–54.

The defense argued that it was equally likely that Cherie Palmer had murdered Zimmerman. Trial III Tr., Vol. IV at 822–30. Defense counsel argued that Charles Palmer, because of his size and strength, would have had no reason to use an electrical cord to strangle Zimmerman; he could have done so with his bare hands. *Id.* at 827.

At the close of evidence, the court instructed the jury that Palmer had been charged as follows: "On or about the 6th day of March, 1979, in Hall County, Nebraska, the Defendant Charles Jess Palmer, then and there being, did in the perpetration of a robbery, kill Eugene Zimmerman...." Instruction No. 2, St. Ct. File, Vol. IV at 758. With respect to the elements of the crime, the court instructed the jury that:

1. On or about the 6th day of March, 1979, in Grand Island, Hall County, Nebraska, the defendant Charles Jess Palmer did kill one Eugene William Zimmerman in the following manner:
 a. That the defendant strangled the said Eugene William Zimmerman; and
 b. That the strangulation was the proximate cause of the death of the said Eugene William Zimmerman; and
2. That said killing was done while the said Charles Jess Palmer was in the perpetration of a robbery.

Instruction No. 6, St. Ct. File, Vol. IV at 762.

The jury was further instructed that an element of robbery was "that such taking was *done with intent to rob or steal.*" *Id.* (emphasis added). With respect to intent, the jury was instructed that "criminal intent is a material and necessary element of the crime of First Degree Murder as charged against the defendant. But the intent required is not an intent to kill Eugene William Zimmerman but is an intent to deprive him of money or personal property of value." Instruction No. 7, St. Ct. File, Vol. IV at 764.

A three-judge panel conducted a sentencing hearing. Trial III Tr., Vol. V (May 25, 1984, and September 6, 1984). At the hearing, defense counsel presented evidence of convictions and sentences in other murder cases. See Trial III, Ex. 62 (*State v. Schaeffer*); Trial III, Exs. 63, 64, and 65 (*State v. Roewert*); Trial III, Exs. 66, 67, and 68 (*State v. Floyd*); Trial III, Exs. 71 and 72 (*State v. Thomton*); Trial III, Ex. 73 (*State v. Lynch*); Trial III, Ex. 74 (*State v. Jones*). Cherie Palmer's conviction and sentence were also offered into evidence. Trial III, Ex. 76. The sentencing panel also admitted Palmer's presentence investigation report and Palmer's response thereto. Trial III, Ex. 55 and Ex.

77. In mitigation, defense counsel offered a statement of Palmer's sister showing that Palmer had a turbulent childhood and had been subjected to abuse by his stepfather. Trial III, Ex. 75. With respect to the "murder to conceal identity" aggravator, Palmer's attorney argued that the aggravator amounted to "impermissible doubling up," *id.*, but he did not argue that the aggravator was inapplicable. Trial III Tr., Vol. V at 933. In response, the prosecutor argued that family history should not remain a mitigating circumstance "into middle age." *Id.* at 922. On September 6, 1984, the panel sentenced Palmer pursuant to Neb.Rev.Stat. § 29–2522.[7] The panel found that the statutory aggravators of "murder to conceal identity" and "manifesting exceptional depravity," Neb.Rev. Stat. § 29–2523(1)(b) and (d), applied to the case, but found no mitigating circumstances.[8] St. Ct. File at 177–78, Order of Sentence (Sept. 6, 1984). The court stated that the evidence relating to Palmer's childhood and the abusive conduct of Palmer's stepfather toward the defendant, his sister, and his mother "does not give rise to a mitigatory circumstance." *Id.* at 181. In support of aggravator 1(b), the panel stated:

> In each case in which the court imposes the death sentence, the determination of the court shall be in writing and shall be supported by written findings of fact based upon the records of the trial and the sentencing proceeding, and referring to the aggravating and mitigating circumstances involved in its determination.
> Neb.Rev.Stat. § 29–2522.

7. At the time of Palmer's sentencing, that statute provided:

> After hearing all of the evidence and arguments in the sentencing proceeding, the judge or judges shall fix the sentence at either death or life imprisonment, but such determination shall be based upon the following considerations:
> (1) Whether sufficient aggravating circumstances exist to justify imposition of a sentence of death;
> (2) Whether sufficient mitigating circumstances exist which approach or exceed the weight given to the aggravating circumstances; or
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

8. The sentencing panel also found that the jury "found the defendant guilty of murder in the first degree on the charge set out in the Information that he *did willfully and purposely kill* Eugene D. Zimmerman while in the commission of the act of robbing Eugene D. Zimmerman of property of value." St. Ct. File at 176 (emphasis added). To the contrary, the record shows the jury made no such finding.

The evidence is that the defendant and his wife, Cheri Hanson Palmer, had been at the home of the decedent, which was also his place of business, on previous occasions and were known to both the decedent and his wife. The robbery was in large part completed prior to the killing of Eugene D. Zimmerman by defendant.

*Id.* at 177. In support of the exceptional depravity aggravator the sentencing panel stated,

Death in this case was caused by strangling. To accomplish the strangling the defendant employed an electrical cord which was wrapped around the neck of the victim and so tightened as to fracture the windpipe of the victim and to cause his death by suffocation. The evidence does not indicate that the act of killing itself was prolonged or lengthy so as to rise to the level of being 'especially' heinous, atrocious or cruel when compared with other cases of murder in the first degree.

The evidence further indicates, that, in the course of the robbery and the disabling of the victim in connection with the robbery the victim had been removed from the location at which a weapon had been available to him; had been bound with his hands behind his body; had been struck about the head sufficiently to knock him to the floor; and had been placed in a condition of inability to resist or otherwise to threaten the defendant.

*Id.* at 178–79. The panel again sentenced Palmer to death. *Id.* at 182–83.

The panel also stated that the murder was comparable to one committed by Wesley Peery.[9] *Id.* at 179. The panel also stated, without elaboration, that it had performed a proportionality review pursuant

to Neb.Rev.Stat. § 29–2522(3), comparing the murder to all other murders committed since 1973, and found Palmer's sentence proportionate. *Id.* at 182. The cases compared are not named.

### 1. Direct Appeal

Palmer's third conviction was affirmed on direct appeal. *Palmer III,* 399 N.W.2d at 706. In *Palmer III,* the Nebraska Supreme Court rejected Palmer's ex post facto and bill of attainder arguments, as well as a sufficiency of evidence challenge. *Id.* at 714. The court found the evidence "more than sufficient for the jury to find the defendant guilty of felony-murder," but did not discuss sufficiency of the evidence to support the imposition of the death penalty. *Id.* The court also rejected Palmer's posttrial double jeopardy challenge, finding that Palmer's second conviction had been reversed for procedural error and not for insufficiency of evidence and further finding the evidence adduced in his second trial was sufficient to convict him of felony murder. *Id.* at 719. Again, the court did not address sufficiency of the evidence to support imposition of the death penalty in connection with the double jeopardy claim. The court similarly rejected Palmer's contentions that refusal to consider a lesser-included offense and sentencing by a three-judge panel instead of a jury were constitutionally infirm. *Id.* at 724–25.

Palmer also raised the issue of the constitutional validity of the "exceptional depravity" aggravator in his direct appeal. *Id.* at 713. The court first noted that "exceptional depravity" had been defined in earlier cases to mean "totally and senselessly bereft of regard for human life." *Id.* at 729–30. The court then compared Palmer's crime to several cases in which

---

**9.** That murder also involved a robbery at a rare coin shop. *State v. Peery,* 199 Neb. 656, 261 N.W.2d 95, 104 (1977). The victim was bound and shot three times in the head. *Id.* at 97.

such "exceptional depravity" had been found.[10] *Id.* It set forth several "objective factors" to distinguish a death penalty case from a case where the death penalty is not imposed and adopted a five-factor test to determine whether "exceptional depravity" existed.

> [F]or the purpose of [applying] § 29–2523(1)(d) as an aggravating circumstance in determining whether the death penalty may be imposed, we hold that "exceptional depravity" in a murder exists when it is shown, beyond a reasonable doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim.

*Id.* at 731–32 (adopting the factors set forth in *State v. Gretzler*, 135 Ariz. 42, 659 P.2d 1, 10 (1983)). The Nebraska Supreme Court applied those factors to Palmer's case and found Zimmerman's murder manifested exceptional depravity under the first prong of section 29–2523(1)(d). *Id.* at 732. The court further found that Zimmerman's murder was "especially heinous, atrocious, or cruel," and thus satisfied the second prong of section 29–2523(1)(d), although the sentencing panel had expressly found that the murder was not heinous. *Id.;* St. Ct. File at 178.

The court also conducted a proportionality review as required by Neb.Rev.Stat. § 29–2521.03.[11] Over a vigorous dissent by then-Chief Justice Krivosha, *Palmer III*, 399 N.W.2d at 738–82, the court compared Palmer's crime to "the records in all *cases in which the death penalty was imposed* for offenses committed on or after April 20, 1973," instead of comparing the crime to similar first-degree murders. *Id.* at 737–38 (emphasis added). The court found the sentence was proportional, and Palmer's conviction and sentence of death were both affirmed. *Id.*

## 2. State Court Post–Conviction Proceedings

Palmer then filed an action for post-conviction relief in Hall County, Nebraska, District Court. An evidentiary hearing was held on June 19, 1995. St. Ct. File, Transcript of Post–Conviction Hearing at 10 ("Post–Conv.Hrg.Tr."). At the hearing, Palmer elicited the testimony of John A. Wolf, the attorney who had been appointed lead counsel to represent Palmer in his first trial. *Id.* A young lawyer in his office, Jerry Milner, was appointed co-counsel. *Id.* at 11. Wolf testified that at the time he was appointed, he had never defended a murder trial. *Id.* at 8. Wolf had never participated in a capital sentencing procedure before the sentencing hearing in Palmer's first trial. *Id.* at 18.

Wolf testified that he had read and researched the statute regarding aggravating and mitigating factors, but had not

---

**10.** The Nebraska Supreme Court compared Zimmerman's murder to murders committed by Richard Holtan, Erwin Charles Simants, Wesley Peery, Willie Otey, Steven Roy Harper, Carey Dean Moore, and Randall Reeves, all of whom had been sentenced to death. *Palmer III*, 399 N.W.2d at 729–30. In the intervening seventeen years since *Palmer III* was decided, only one of these defendants has been executed: Willie Otey.

**11.** That statute provided that "[t]he Supreme Court shall, upon appeal, determine the propriety of the sentence in each case involving a criminal homicide by comparing such case with previous cases *involving the same or similar circumstances.*" Neb.Rev.Stat. § 29–2521.03 (emphasis added). It further provided the Supreme Court with authority to reduce sentences found to be greater than sentences imposed in the same or similar circumstances. *Id.*

consulted with any other counsel. *Id.* at 18–19. With respect to mitigating factors, he stated, "I know I went over them with Charlie [Palmer] and asked him if any of those applied." *Id.* at 17. He further testified that he did not think he presented any evidence regarding mitigating circumstances, because he "wasn't aware of any mitigating" factors. *Id.* at 18. He did not recall whether he had conceded the existence of the aggravator that the murder had been committed to conceal another crime under section 29–2523(1)(b), but stated that if he had it was because "it was pretty obvious." *Id.* at 19–20.

He did not recall whether he challenged the sufficiency of evidence to support the death penalty on Palmer's direct appeal after the first trial, *id.* at 20, but the record shows he did not. *See* Brief of Appellant, *Palmer I.* Moreover, he did not object to Cherie Palmer's statements in the presentence investigation report on the ground of marital privilege because he thought it would not have "done much good." Post–Conv. Hrg. Tr. at 22. He further did not recall whether he had ever considered filing a plea in bar or other motion raising the double jeopardy issue before Palmer's second trial. *Id.* at 23.

With respect to Palmer's second trial, Wolf testified that he was assisted by attorney David A. Bush. *Id.* at 23. He testified that he knew that the state intended to call Cherie Palmer and that he knew what she would testify about from reading the presentence investigation in Palmer's first trial. *Id.* at 24–25. He had not interviewed or deposed Cherie Palmer. *Id.* With respect to the sentencing phase in Palmer's second trial, Wolf again testified that he did not recall putting on any evidence in mitigation "because I don't think any applied." *Id.* at 32.

Attorney Bush also testified at the post-conviction hearing. *Id.* at 45. He assisted Wolf in Palmer's second and third trials.

*Id.* He testified that he did "an extensive amount of investigation ... in the sense of legal briefing and the like" regarding the "heinous, atrocious and cruel and manifests exceptional depravity" aggravator, but did not do any investigation regarding the "murder committed to conceal identity" aggravator because he was "not sure what investigation would have been warranted." *Id.* at 51. He further testified that he believed he had contacted Palmer's sister to obtain evidence about Palmer's turbulent childhood before the sentencing hearing in either the second or third trial. *Id.* at 53. The record shows that a statement by Palmer's sister was admitted in the third sentencing hearing. *See* Trial III, Ex. 75. He also testified that before the sentencing hearing in the third trial, he had extensively investigated the proportionality review portion of the sentencing procedure by obtaining the records from other first degree murder cases. *Id.*

Ronald York, a probation officer, also testified at the post-conviction hearing. *Id.* at 59. He testified that he did the original and subsequent presentence investigation reports on Palmer. *Id.* at 61. He stated that the reports included a statement from Cherie Palmer. *Id.* at 62. He further testified that he did no investigation on any mitigating circumstances and that Palmer's attorneys did not ask him to conduct any sort of investigation or to obtain any school or health records when preparing Palmer's presentence investigation reports. *Id.* at 66–68. Further, he stated that he did not contact or consult any of Palmer's friends, neighbors, or relatives, other than Cherie Palmer. *Id.* at 68. He did not interview Palmer while preparing the reports; he talked only to the attorneys who said that Palmer had nothing to say. "He was advised not to talk to me." *Id.* at 66. The Hall County District Court denied the petition. St. Ct. File,

Judge's Notes & Journal Entries at 126–34 (Nov. 21, 1995).

Palmer appealed the denial of post-conviction relief to the Nebraska Supreme Court. The Nebraska Supreme Court found that Palmer was not entitled to relief. *State v. Palmer*, 257 Neb. 702, 600 N.W.2d 756 (1999) ("*Palmer IV*" or "state post-conviction action"). The court declined to reconsider issues that had been raised and addressed in the direct appeal. *Id.* at 767–68. It therefore did not discuss Palmer's claims with respect to: (1) the comparative review analysis and proportionality; (2) the arbitrariness and capriciousness of Palmer's sentence; (3) the constitutionality of the Nebraska death penalty statutes as applied; (4) a violation of the ex post facto provisions of the United States and Nebraska Constitutions; (5) failure to give a lesser-included offense instruction on manslaughter and second degree murder; and (6) the unconstitutional and/or illegal arrest of Palmer in Texas.[12] *Id.* The court also found certain claims were procedurally barred. *Id.* at 768.

The court addressed the merits of ten claims. With respect to Palmer's claim that his conviction for felony murder was unconstitutional because there had been no finding of the requisite intent, the court found, without discussion, "[I]t is clearly established that a person may be convicted of first degree murder under a felony murder theory without violating his Eighth or Fourteenth Amendment rights." *Id.* at 769. The court also rejected Palmer's claim that amendment of the spousal privilege statute amounted to an unconstitutional bill of attainder. *Id.* at 770.

It also summarily rejected Palmer's claim that the "exceptional depravity" aggravator was unconstitutionally vague. Relying on *Joubert v. Hopkins*, 75 F.3d 1232 (8th Cir.1996), the court stated, "[t]he Court of Appeals has since stated that the exceptional depravity definition under § 29–2523(1)(d), as we narrowed it in *Palmer III*, is constitutional." *Id.* Further, the court found that Palmer had been afforded constitutional notice of the reformulated aggravator in that "[a]t the time of his sentencing hearing, Palmer had notice of the language of § 29–2523(1)(d) and the various fact patterns" that the court had used as specific examples to demonstrate the meaning of "exceptional depravity" in *Palmer III*. *Id.* at 771, 399 N.W.2d 706. The court also rejected Palmer's claims of ineffective assistance of counsel and, in connection with those claims, found that the evidence in the first trial was sufficient to sentence Palmer to the death penalty. *Id.* at 777, 399 N.W.2d 706.

Palmer filed the present action on January 28, 2000, and now seeks habeas corpus relief pursuant to 28 U.S.C. § 2254. Palmer contends that his 1984 conviction and sentence are unconstitutional and void under Article I, §§ 9 and 10, and under the Fifth, Sixth, Eighth, and Fourteenth Amendments of the United States Constitution. All claims have been properly exhausted and no claims are procedurally barred. *See* Filing No. 58, Mem. and Order (D.Neb. Sept. 14, 2001).

## II. Discussion

### A. Applicability of AEDPA— Standard of Review

Review by federal courts of state court decisions for constitutional errors under 28 U.S.C. § 2254 was altered by the Antiterrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254 (AEDPA), which became effective on April 24, 1996. A threshold question is the applicability of the AEDPA to Palmer's action.

---

**12.** This action effectively adopted the findings made in *Palmer III* on these issues.

## 1. Second or Successive Petition

The AEDPA has further restricted the power of federal courts to grant writs of habeas corpus to state prisoners. *Miller–El v. Cockrell*, 537 U.S. 322, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003). It contains strict restrictions on the filing of second or successive petitions. 28 U.S.C. § 2244. Under the AEDPA, any habeas corpus claim presented in a second or successive habeas corpus application that had been presented in a prior application is subject to dismissal. *Id.* Further, any claim that was *not* presented in a prior application is also subject to dismissal unless the applicant can show either: (1) "that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable," or (2) that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence" and "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(1) and (2)(A) and (B)(i) and (ii).

This court must thus determine whether Palmer's present petition constitutes a second or successive petition. The court finds that it is not. Not every habeas corpus petition that is filed after a prior one is properly considered a "second or successive" filing in the technical sense required by the AEDPA. *Muniz v. United States*, 236 F.3d 122, 125 (2d Cir.2001). Although the AEDPA does not define what constitutes a "second or successive" application, courts generally acknowledge that the interpretation of "second or successive" involves the application of pre-AEDPA abuse-of-the-writ principles. *Stewart v. Martinez–Villareal*, 523 U.S.

637, 643–45, 118 S.Ct. 1618, 140 L.Ed.2d 849 (1998) (relying on pre-AEDPA law to determine that section 2244(b) did not bar petitioner's request to reopen habeas claim raised in prior petition but dismissed by district court as premature); *Crouch v. Norris*, 251 F.3d 720, 723 (8th Cir.2001).

To hold that every refiled petition is second or successive under AEDPA "would mean that a dismissal of a first habeas petition for technical procedural reasons would bar the prisoner from ever obtaining federal habeas review." *Martinez–Villareal*, 523 U.S. at 645, 118 S.Ct. 1618 (stating "[t]his may have been the second time that respondent had asked the federal courts to provide relief on his [previously unripe] claim, but this does not mean that there were two separate applications, the second of which was necessarily subject to § 2244(b)"). The Seventh Circuit has acknowledged the possibility that

> a claim in no sense abusive, because it could not have been raised earlier, yet not within the dispensation that section 2244(b)(2) grants for the filing of some second or successive petitions, would have sufficient merit that the barring of it would raise an issue under the clause of the Constitution that forbids suspending federal habeas corpus other than in times of rebellion or invasion.

*In re Page*, 179 F.3d 1024, 1025 (7th Cir. 1999).

There is a substantive difference between a dismissal for failure to exhaust and a dismissal as premature or unripe. Palmer's first habeas corpus petition was originally dismissed as premature and later as frivolous, but was never dismissed for failure to exhaust. This case is thus on the same procedural footing as the petitioner's action in *Stewart v. Martinez–Villareal*, 523 U.S. at 645, 118 S.Ct. 1618 (holding that a claim dismissed as prema-

ture and later refiled was not subject to the AEDPA); *see also Slack v. McDaniel*, 529 U.S. 473, 486–487, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000) (noting that a petition "unadjudicated on its merits ... is not a second or successive petition"). In this case, the Eighth Circuit expressly noted that Palmer's posttrial double jeopardy challenge would not amount to a second or successive petition. *Palmer (Fed.) II*, 961 F.2d at 764.

This action is Palmer's first habeas corpus petition on all issues except the pretrial double jeopardy issue. Accordingly, the court finds that the action is not a second or successive petition and that 28 U.S.C. § 2244 does not apply to this case.[13]

## 2. Substantive Standard of Review

The inquiry does not end at the finding that Palmer's present petition is not second or successive. The court must still determine whether the AEDPA's revised standards of review will apply to the action. "Whether a petition is a 'second or successive' application under the AEDPA is an entirely different question" than whether AEDPA applies to a petition filed after the Act's effective date. *Weaver v. Bowersox*, 241 F.3d 1024, 1029 (8th Cir. 2001).

Since the AEDPA does not apply retroactively to cases pending when the Act was signed into law,[14] the inquiry is whether Palmer's action can be said to have been "pending" on April 24, 1996. *Lindh v. Murphy*, 521 U.S. 320, 327, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997). Whether the AEDPA applies to a state prisoner turns on what was before a federal court on the date the AEDPA became effective on April 24, 1996. *Woodford v. Garceau*, 538 U.S. 202, ——, 123 S.Ct. 1398, 1399, 155 L.Ed.2d 363 (2003).[15] If, on that date, the state prisoner had before a federal court an application for habeas relief seeking an adjudication on the merits of the petitioner's claims, then amended section 2254(d) does not apply. *Id.* Otherwise, an application filed after AEDPA's effective date should be reviewed under AEDPA, even if other filings by that same applicant—such as a request for the appointment of counsel or a motion for a stay of execution—were presented to a federal court prior to AEDPA's effective date. *Id.* See also *Ellzey v. United States*, 324 F.3d 521, 524 (7th Cir.2003) (finding an amended petition a continuation of earlier petition for statute of limitations purposes).

**13.** The significance of this holding is that Palmer's claim is exempt from the restriction that a new rule such as that announced in *Ring v. Arizona*, 536 U.S. 584, 588, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), cannot be applied unless the Supreme Court expressly makes the rule retroactive. See *Tyler v. Cain*, 533 U.S. 656, 666, 121 S.Ct. 2478, 150 L.Ed.2d 632 (2001); *cf. Moore v. Kinney*, 320 F.3d 767, 771 n. 3 (8th Cir.) (noting that "[t]he Supreme Court did not, and has not, expressly made the ruling in *Ring* retroactive"), *cert. denied*, —— U.S. ——, 123 S.Ct. 2580, 156 L.Ed.2d 609 (2003) (applying section 2244). See *Ring* discussion later in this opinion.

**14.** The explicitly retroactive provisions for death penalty cases set out in 28 U.S.C. § 2261(b) and (c) do not apply to this case.

See *Hunter v. Bowersox*, 172 F.3d 1016, 1020 n. 3 (8th Cir.1999). There has been no showing that Nebraska meets the requirements of that statute. *See, e.g., Ryan v. Hopkins*, No. 4:CV95–3391, 1996 WL 539220 (D.Neb. July 31, 1996) (noting "because Nebraska's system is not in compliance with the requirements of section 2261 [the explicitly retroactive section] does not apply.").

**15.** The Eighth Circuit's holding that "AEDPA's provisions apply to all habeas corpus petitions filed after the Act's effective date," *Weaver v. Bowersox*, 241 F.3d at 1029, can no longer be considered good law after the Supreme Court's decision in *Woodford*, 538 U.S. 202, ——, 123 S.Ct. at 1401. *Woodford* requires at least an inquiry into whether a merely procedural motion or a substantive issue was pending in an earlier action. *Id.*

■ On the date the AEDPA was passed, Palmer had an action pending that raised issues on the merits. The petition in Palmer's initial habeas petition sought resolution of the merits of the double jeopardy/sufficiency of evidence issue. The court resolved the pretrial component of that claim, but reserved judgment on the posttrial component, effectively finding the double jeopardy issue premature as to the completed third trial. The claims in the present petition, especially those that involve sufficiency of evidence at the first and second trials as part of Palmer's ineffective assistance claim and the double jeopardy issues, are inextricably tied to claims raised in Palmer's first petition.

Only Palmer's pretrial double jeopardy challenge has been addressed on its merits. Palmer's other claims, which involve challenges to his third conviction, as well as claims relating to his first and second trials, could not have been raised earlier. Most claims were premature, and Palmer was unable to raise his ineffective assistance of counsel claims because he was represented by the same counsel. In addition, because both the federal and state courts held Palmer's actions in abeyance pending resolution of proceedings in the other court, the present petition is a continuation of the first and should relate back to the first. The lengthy delays in resolving the merits of Palmer's claims can largely be attributed to actions (or inactions) by the courts. The court is thus inclined to view this action as a natural extension of the proceedings in Palmer's first habeas corpus action, *Palmer v. Drum*, 84–L–144.[16]

Accordingly, since Palmer's action was pending, or is deemed to have been pending, when the AEDPA was passed, pre-AEDPA standards of review should apply. This finding is of no real consequence, however, because the court would reach the same conclusion under either the pre- or post-AEDPA standards of review. Although the AEDPA altered the substantive standards by which federal courts review state court determinations of law under 28 U.S.C. § 2254, those subtle distinctions would not affect the outcome of this action. This court's findings generally relate to legal, not factual, issues.

Under pre-AEDPA standards, the reviewing court would give the state court's factual findings a "presumption of correctness" and would review *de novo* state court interpretations of federal law, as well as mixed questions of fact and law. *See Jones v. Delo*, 258 F.3d 893, 900 (8th Cir. 2001) (regarding factual findings); *Henderson v. Norris*, 258 F.3d 706, 707 (8th Cir.2001) (regarding issues of law); *Stringer v. Hedgepeth*, 280 F.3d 826, 829 (8th Cir.2002) (same). A court could overturn a state court's factual findings if they were not supported by evidence. *See Jones*, 258 F.3d at 900–901.

Under the AEDPA, a federal court may grant a writ of habeas corpus if the relevant state court decision is "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1); *Lockyer v. Andrade*, 538 U.S. 63, ——, 123 S.Ct. 1166, 1172, 155 L.Ed.2d 144 (2003). A state court decision is "contrary to" the Supreme Court's es-

---

**16.** Principles of equitable tolling and relation back support this interpretation. *See Marsh v. Soares*, 223 F.3d 1217, 1219 (10th Cir.2000) (holding "relation back" doctrine inapplicable when initial habeas petition had been dismissed because there was no pleading to which the new petition could relate back);

*Warren v. Garvin*, 219 F.3d 111, 114 (2d Cir. 2000) (same). Both equitable tolling and relation back principles can be invoked in a proper habeas case. *Cross–Bey v. Gammon*, 322 F.3d 1012, 1014 (8th Cir.2003), petition for cert. filed, No. 03–6112 (June 26, 2003).

tablished precedent: (1) if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law (*i.e.*, applies a rule that contradicts the governing law in Supreme Court cases); or (2) if the state court confronts facts that are materially indistinguishable from relevant Supreme Court precedent and arrives at a result opposite to that reached by the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 404–05, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). A state court decision is an "unreasonable application" of clearly established federal law if it correctly identifies the governing legal rule but applies it unreasonably to the facts of a particular case. *Id.* If the state court's application of clearly established federal law was not unreasonable, a federal court may not grant habeas relief even if in the federal court's judgment its application was incorrect. *Williams*, 529 U.S. at 411, 120 S.Ct. 1495; *see also Penry v. Johnson*, 532 U.S. 782, 793, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001).

"Clearly established federal law" under section 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision and includes whatever would qualify as an "old rule" under the Supreme Court's *Teague* jurisprudence.[17] *Id.* at 411, 120 S.Ct. 1495. The "clearly established" phrase refers to the holdings, as opposed to the dicta, of the Supreme Court's decisions as of the time of the relevant state court decision. *Id.*

Also, under the AEDPA, factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1). A decision adjudicated on the merits in a state court and based on a factual determination will not be over-

turned on factual grounds unless it is objectively unreasonable in light of the evidence presented in the state court proceeding. *Miller–El v. Cockrell*, 537 U.S. at ——, 123 S.Ct. at 1040. Nevertheless, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." *Id.* Deference does not by definition preclude relief. *Id.* A federal court can disagree with a state court's credibility determination and, when guided by AEDPA, conclude the decision was unreasonable or that the factual premise was incorrect by clear and convincing evidence. *Id.*

The distinctions, then, are that the court must find factual error to have occurred by clear and convincing evidence and must find legal error to have occurred because the state court result was either contrary to Supreme Court precedent or because the state court unreasonably applied Supreme Court precedent. Even under the AEDPA's marginally more rigorous standards, this court's findings would be the same.

## B. Merits of Petitioner's Claims

### 1. Ex Post Facto (Claim I)

In his first claim, Palmer asserts that the amendment to the spousal privilege statute in 1984 operated as an ex post facto law in violation of the Constitution. In the state court post-conviction action, the Nebraska Supreme Court refused to consider this claim, stating that the court in *Palmer III* had raised and addressed it. *Palmer IV*, 600 N.W.2d at 767–68. This finding effectively adopted the Nebraska Supreme Court's holding in *Palmer III* that amending the spousal privilege statute did not violate the ex post facto prohi-

---

**17.** *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989), sets out when "new rules" of criminal procedure can be applied retroactively in collateral actions. *See Ring* discussion later in this opinion.

bition in the Constitution because the legislature had not created any criminal act, altered the standard of proof necessary for conviction, or altered the punishment prescribed for the crime. *Palmer III,* 399 N.W.2d at 716. In *Palmer III,* the Nebraska Supreme Court analogized the legislative act to a change in the rules of evidence and found that the rights abrogated were not substantial enough to render retroactive application of the statute unconstitutional. *Id.*

Article I, section 10 of the Constitution prohibits the states from passing any ex post facto law. *Carmell v. Texas,* 529 U.S. 513, 520, 120 S.Ct. 1620, 146 L.Ed.2d 577 (2000). The Ex Post Facto Clause incorporates a term of art into a meaning already established when the Constitution was framed. *Id.* at 521–22, 120 S.Ct. 1620. The clause is aimed at laws that retroactively alter the definition of crimes or increase the punishment for criminal acts. *Id.* at 522, 120 S.Ct. 1620. The proscription against ex post facto laws was derived from English common law and applies to four categories of criminal laws: (1) a law that makes an action done before the passing of the law, and which was innocent when done, criminal, and punishes such action; (2) a law that aggravates a crime, or makes it greater than it was, when committed; (3) a law that changes the punishment, and inflicts a greater punishment, than the law that existed when the crime was committed; and (4) a law that alters the legal rules of evidence, and requires less or different testimony to convict the offender, than the law required at the time of the commission of the offence. *Id.*

Palmer's contentions invoke the fourth prong of this definition. *See id.* at 531, 120 S.Ct. 1620 (reaffirming the continued viability of the fourth category and noting that "[a] law reducing the quantum of evidence required to convict an offender or

retrospectively eliminating an element of the offense" violates the Ex Post Facto Clause). Palmer argues that the Nebraska Legislature's amendment of the spousal privilege statute is analogous to the statute challenged in *Carmell* that increased the age limit for application of the "outcry or corroboration" rule in a sexual assault case from age fourteen to age eighteen. *See Carmell,* 529 U.S. at 518–19, 120 S.Ct. 1620. The state argues on the other hand that the amendment to the spousal privilege statute is more closely analogous to the situation presented in *Hopt v. People of Territory of Utah,* 110 U.S. 574, 4 S.Ct. 202, 28 L.Ed. 262 (1884), and *Thompson v. Missouri,* 171 U.S. 380, 18 S.Ct. 922, 43 L.Ed. 204 (1898) (involving competency of witnesses and evidence).

■■ Not every rule that has an effect on whether a defendant can be convicted implicates the Ex Post Facto Clause. *Carmell,* 529 U.S. at 533 n. 23, 120 S.Ct. 1620. Ordinary rules of evidence, for example, do not violate the clause. *Id.* Rules of that nature are ordinarily evenhanded, in the sense that they may benefit either the state or the defendant in any given case. *Id.* at 546, 120 S.Ct. 1620 (noting changes lowering quantum of proof, and thus implicating Ex Post Facto Clause, will always inure to state's benefit, but witness competency laws "do not necessarily run in the State's favor"). More crucially, such rules, by simply permitting evidence to be admitted at trial, do not at all subvert the presumption of innocence, because they do not concern whether the admissible evidence is sufficient to overcome the presumption. *Id.* Thus, it is only evidentiary rules which affect the quantum of evidence, *i.e.,* make it easier for the government to overcome the presumption of innocence, that will violate the Ex Post Facto Clause. *Id.* at 532, 120 S.Ct. 1620. *See also Stogner v. California,* —— U.S. ——,

——, 123 S.Ct. 2446, 2451, 156 L.Ed.2d 544 (2003) (holding retroactive extension of statutes of limitation for serious sexual offenses against minors was ex post facto law and stating in dicta that the new law would alter the quantum of proof by effectively eliminating an existing conclusive presumption forbidding prosecution). In addition, evidentiary rules that simply regulate the mode by which the parties could place facts before the jury, but do not "govern the sufficiency of those facts for meeting the burden of proof," will not violate the Ex Post Facto Clause. *Id.* at 545, 546–47, 120 S.Ct. 1620.

■ The court finds the change to the spousal privilege statute is closer to a witness competency rule. The change did not affect the amount of evidence necessary to convict the defendant; it merely created a class of persons (spouses) competent to testify with respect to certain issues (crimes of violence). *See Janecka v. Cockrell,* 301 F.3d 316, 324 (5th Cir.2002) (regarding change in burden of production to refute exculpatory evidence in a confession); and *Neill v. Gibson,* 278 F.3d 1044, 1052 (10th Cir.2001) (regarding admissibility of victim-impact statements). The court finds the spousal privilege statute is more in the nature of an ordinary rule of evidence that does not violate the Ex Post Facto Clause. *Carmell,* 529 U.S. at 533 n. 23, 120 S.Ct. 1620. Such rules are "ordinarily evenhanded, in the sense that they may benefit either the State or the defendant in any given case." *Id.* Amendment of the spousal privilege statute to allow spousal testimony in certain cases would not always inure to the benefit of the state. The statute would also allow evidence that favored a defendant.

Accordingly, the court finds that the amendment to the spousal privilege did not operate as an ex post facto law against Palmer.

### 2. Bill of Attainder (Claim II)

■ On a closely related issue, Palmer also argues that the passage of the spousal privilege amendment operated as a bill of attainder against him in violation of Article I, Section 10 of the Constitution.[18] The Constitution includes two clauses prohibiting enactment of "bills of attainder." *See* U.S. Const. art. I, §§ 9, 10. Section 9 applies to Congress; section 10 to the states. *Id.* Briefly stated, a constitutionally proscribed bill of attainder is "a law that legislatively determines guilt and inflicts punishment upon an identifiable individual without provision of the protections of a judicial trial." *Nixon v. Administrator of Gen. Servs.,* 433 U.S. 425, 468, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977); *see also United States v. Lovett,* 328 U.S. 303, 315, 106 Ct.Cl. 856, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) ("[l]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution."). Put another way, the Bill of Attainder Clause bars the imposition of punishment resulting from "trial by legislature." *United States v. Brown,* 381 U.S. 437, 442, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965).

■ A statute can be a bill of attainder only if (1) it "determines guilt and inflicts punishment," (2) "upon an identifiable individual," (3) "without provision of the protections of a judicial trial." *Nixon,* 433

---

**18.** This argument is also connected to Palmer's ineffective assistance of counsel claim. Palmer argues that his counsel's failure to make this argument in his direct appeal amounted to ineffective assistance. The Ne-

braska Supreme Court found that Palmer could not show prejudice caused by counsel's lack of argument, since it found that the amendment was not a bill of attainder. *Palmer IV,* 600 N.W.2d at 770.

U.S. at 468, 97 S.Ct. 2777; *United States v. Van Horn,* 798 F.2d 1166, 1168 (8th Cir.1986). Thus, to constitute a bill of attainder, the statute must (1) specify affected persons, (2) impose punishment, and (3) fail to provide for a judicial trial. *See Selective Serv. Sys. v. Minnesota Pub. Int. Research Group,* 468 U.S. 841, 847, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984). The party challenging the statute has the burden of "establish[ing] that the legislature's action constituted punishment and not merely the legitimate regulation of conduct." *Nixon,* 433 U.S. at 476 n. 40, 97 S.Ct. 2777.

The state post-conviction court found that Palmer was not subject to a bill of attainder because the amended statute did not specify persons to be punished.

> The privilege, as amended, neither names specific persons or groups to be punished nor isolates past activity by which persons can later be designated as appropriate candidates for punishment. The amended spousal privilege is not concerned with distinguishing between persons, but between crimes. The amendment allowed spousal testimony to be admitted in future trials for violent crimes. Therefore, the amendment of § 27–505 was not a bill of attainder against Palmer.

*Palmer IV,* 600 N.W.2d at 769. *Id.*

Whether the challenged statutory amendment "specifies" Palmer, or singles him out, is a close question. The court is inclined to find that it does. Various guideposts aid in determining whether legislation singles out a person or class within the meaning of the Bill of Attainder Clause. *See, e.g., Selective Serv. Sys.,* 468 U.S. at 847, 104 S.Ct. 3348. First, the court considers whether the statute or provision explicitly names the individual or class, or instead, describes the affected population in terms of general applicability. *Id.; Nixon,* 433 U.S. at 469–71, 97 S.Ct. 2777. Second, intricately connected with the first, is whether the identity of the individual or class was "easily ascertainable" when the legislation was passed. *Brown,* 381 U.S. at 448–49, 85 S.Ct. 1707. Third, the court examines whether the legislation defines the individual or class by "past conduct [that] operates only as a designation of particular persons." *Selective Serv. Sys.,* 468 U.S. at 847, 104 S.Ct. 3348. Finally, the court reviews whether the past conduct defining the affected individual or group consists of "irrevocable acts committed by them." *Id.*

■ Under those standards, this court finds that although the statute does not single out Palmer by name, his identity was easily ascertainable at the time the statute was amended. Palmer has presented compelling evidence that the bill was specifically aimed at him. *See* Legislative History, LB 696, Floor Debate (Jan. 17, 1984). The bill's introduction was occasioned by the reversals in *Palmer I* and *Palmer II.* The prosecutor in the second trial testified to the legislature in support of the amendment. *Id.* at 6. *Cf. WMX Tech., Inc. v. Gasconade County, Mo.,* 105 F.3d 1195, 1203 (8th Cir.1997) (noting no evidence of any legislative intent to punish in that case).

■ However, even if the specificity element is satisfied, the Bill of Attainder Clause is not automatically implicated. *Nixon,* 433 U.S. at 472, 97 S.Ct. 2777. The court must next inquire whether the statutory amendment "inflict(ed) punishment" within the constitutional proscription against bills of attainder. *Id.* at 472–73, 97 S.Ct. 2777. Three inquiries determine whether a statute inflicts punishment on the specified individual or group: "(1) whether the challenged statute falls within the historical meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and severity of bur-

dens imposed, reasonably can be said to further nonpunitive legislative purposes'; and (3) whether the legislative record 'evinces a congressional intent to punish.'" *Selective Serv. Sys.*, 468 U.S. at 852 (quoting *Nixon*, 433 U.S. at 473, 475–76, 97 S.Ct. 2777). Thus, to rise to the level of "punishment" under the Bill of Attainder Clause, harm must fall within the traditional meaning of legislative punishment, must fail to further a nonpunitive purpose, or must be based on a legislative intent to punish. *Planned Parenthood of Mid–Missouri & Eastern Kansas, Inc. v. Dempsey*, 167 F.3d 458, 465 (8th Cir.1999).

 Traditionally, bills of attainder sentenced the named individual to death, imprisonment, banishment, the punitive confiscation of property, or erected a bar to designated individuals or groups participating in specified employments or vocations. *Nixon*, 433 U.S. at 473–74, 97 S.Ct. 2777. Courts apply "a functional test of the existence of punishment, analyzing whether the law under challenge, viewed in terms of the type and severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes." *Id.* at 475–76, 97 S.Ct. 2777. Where such legitimate legislative purposes do not appear, it is reasonable to conclude that punishment of individuals disadvantaged by the enactment was the purpose of the decision-makers. *Id.* Applying the functional approach to this case, this court rejects the argument that the amendment of the spousal privilege statute rests upon a legislative determination of Palmer's blameworthiness and its desire to punish him. *See id.* Notably, the amendment to the statute furthers a nonpunitive purpose.

Legislation designed to guarantee the availability of evidence for use at criminal trials is a fair exercise of Congress' responsibility to the 'due process of law in the fair administration of criminal justice,' and to the functioning of our adversary legal system which depends upon the availability of relevant evidence in carrying out its commitments both to fair play and to the discovery of truth within the bounds set by law.

*Nixon*, 433 U.S. at 477, 97 S.Ct. 2777 (quoting *United States v. Nixon*, 418 U.S. 683, 713, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974)).

The evidence presented by Palmer, while it may show prosecutorial over zealousness, does not rise to the level of proof of legislative intent to punish. There are legitimate justifications for the statutory amendment. Because Cherie Palmer's testimony was pivotal, the legislative act furthered Palmer's conviction and sentencing; however, the nexus between the amendment to the spousal privilege statute and Palmer's conviction is attenuated, especially since the testimony eventually became "available" as a result of the Palmers' divorce. The court thus finds that Palmer has not met his burden of showing that the amendment to the spousal privilege statute is a bill of attainder.

### 3. Double Jeopardy (Claim IX)

In his ninth claim, Palmer argues that the prosecutor's actions in the second and third trials, coupled with the trial court's erroneous admission of Cherie Palmer's testimony, violated Palmer's right not to be put in double jeopardy. Palmer argues that prosecutorial misconduct—conduct showing an intent to gain an unfair advantage at trial—which is analogous to "goading to mistrial," prevented Palmer's acquittal in the second trial. Consequently, Palmer's argues that his third trial violated double jeopardy.

 The state argues that Palmer is collaterally estopped from making this argument. The court first finds that Palmer is not. "The loss of a pretrial double jeopardy challenge on the merits

does not preclude a defendant from raising a double jeopardy challenge in a posttrial habeas petition." *Palmer (Fed.) II*, 961 F.2d at 774; *see also Stratton v. United States*, 862 F.2d 7, 8 (1st Cir.1988) (per curiam) (noting "[a] pre-trial double jeopardy claim may fail where a post-trial one will succeed"). The only issue addressed in Palmer's federal court habeas corpus action was whether Palmer's impending trial (his third trial) would violate the Double Jeopardy Clause. *See Palmer (Fed.) II*, 961 F.2d at 764 (noting "Palmer did not (and could not) challenge the legality of the third conviction or resulting sentence because the third trial had not yet occurred"). The Eighth Circuit's finding that Palmer's "third trial did not violate double jeopardy" refers only to whether Palmer properly could be tried for a third time and not, as the state argues, to the sufficiency of evidence to support his conviction in the third trial.[19] The challenge the Eighth Circuit addressed was a challenge to an impending trial. *Id.* Prosecutorial misconduct was addressed only in the context of whether Cherie Palmer's testimony had been obtained through prosecutorial and judicial misconduct so as to prevent its consideration as evidence to support Palmer's conviction in the second trial.

Palmer's argument in the present claim is that the misconduct amounts to or can be compared to a "goading to mistrial" situation. *See, e.g., Oregon v. Kennedy*, 456 U.S. 667, 679, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982); *United States v. Wallach*, 979 F.2d 912, 916 (2d Cir.1992). This is a different issue. Actions by a prosecutor that may not quite rise to the level of misconduct that would preclude use of the resultant evidence to support a sufficiency

finding in a pretrial double jeopardy challenge could arguably support a finding of "goading to mistrial" or of obtaining an unfair advantage short of goading to mistrial. *United States v. Catton*, 130 F.3d 805, 807 (7th Cir.1997). In other words, the evidence is viewed under a different standard in the former situation than the latter.

The Double Jeopardy Clause of the Fifth Amendment provides that no person shall be "twice put in jeopardy of life or limb" for the same offense. U.S. Const. amend. V. The Double Jeopardy Clause protects against a second prosecution for the same offense after acquittal, a second prosecution for the same offense after conviction, and multiple punishments for the same offense. *See Sattazahn v. Pennsylvania*, 537 U.S. 101, 106, 123 S.Ct. 732, 154 L.Ed.2d 588 (2003) (plurality opinion). In general, double jeopardy will "not prevent the government from retrying a defendant who succeeds in getting his first conviction set aside, through direct appeal or collateral attack, because of some error in the proceedings leading to conviction." *Lockhart v. Nelson*, 488 U.S. 33, 38, 109 S.Ct. 285, 102 L.Ed.2d 265 (1988) (citation omitted). There are a few exceptions to this rule. Palmer's pretrial double jeopardy challenge addressed in prior federal court proceedings is one such example: if a conviction is reversed because the evidence is legally insufficient to convict, retrial is barred because this is equivalent to a judgment of acquittal for double jeopardy purposes. *See id.*, 488 U.S. at 39, 109 S.Ct. 285.

■ .Generally, the Double Jeopardy Clause will not bar retrial if a defendant requests a mistrial. *United States v. Din-*

---

**19.** Palmer now argues, in connection with both his posttrial double jeopardy challenge and his ineffective assistance of counsel claim, that the evidence from the third trial is insufficient to convict him of a crime eligible for the death penalty. There has been no decision on that issue that must be afforded preclusive effect.

*itz,* 424 U.S. 600, 607, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976). Double jeopardy will bar a retrial, however, in the limited situation where the government engages in prosecutorial misconduct that gives rise to a successful motion for mistrial, and such misconduct "was intended to provoke the defendant into moving for a mistrial." *Oregon v. Kennedy,* 456 U.S. at 679, 102 S.Ct. 2083. If the prosecutor deliberately introduces error in order to provoke the defendant into moving for a mistrial and to "rescue" a trial going badly, "the Constitution treats matters as if the mistrial had been declared on the prosecutor's initiative." *United States v. Higgins,* 75 F.3d 332, 333 (7th Cir.1996). This "goading to mistrial" concept may, in an appropriate case, also bar a defendant's retrial in the case of deliberate prosecutorial misconduct undertaken not to provoke a mistrial, but to avoid an acquittal that the prosecutors believed was likely in the absence of their misconduct. *United States v. Wallach,* 979 F.2d at 916.

The argument in favor of such extension is that, without it, a prosecutor would have "an unimpaired incentive to commit an error that would not be discovered until after the trial and hence could not provide the basis for a motion for a mistrial, yet would as effectively stave off an acquittal and thus preserve the possibility of a retrial." *Catton,* 130 F.3d at 807. An example would be where

> the prosecutor does not expect to prevail at this trial—the case in which he knows that his misconduct is likely to be discovered and that if it is discovered the verdict will be set aside either on direct appeal or, later, in a collateral attack on the conviction—and what he is seeking to obtain by committing a reversible error is the opportunity to retry a defendant who but for the error would be acquitted. In such a case, the prosecutor's ultimate aim is not to obtain a conviction at this trial but to obtain a conviction at a subsequent trial....

*Id.*

Under this theory, a defendant asking a court to block a retrial on the basis of prosecutorial error must show

> that the prosecutor committed the error *because* he thought that otherwise the jury would acquit and he would therefore be barred from retrying the defendant. It is not enough that there was an error; it is not enough that it was committed or procured by the prosecutor; it is not enough that it was deliberate prosecutorial misconduct; it must in addition have been committed for the purpose of preventing an acquittal that, even if there was enough evidence to convict, was likely if the prosecutor refrained from misconduct.

*Id.* (emphasis in original). The Eighth Circuit has intimated that it would extend *Oregon v. Kennedy* in a proper case. *See Jacob v. Clarke,* 52 F.3d 178, 181 (8th Cir.1995).

 This court is unwilling to extend the "goading to mistrial" principle to this situation. Palmer has presented compelling evidence that shows the prosecution knew that an acquittal (at the least of imposition of the death penalty) was likely in the absence of Cherie Palmer's testimony. Evidence is lacking, however, on whether any prosecutorial misconduct, assuming it occurred, was deliberate and was undertaken for the purpose of preventing an acquittal. This court is bound by the finding that the trial judge and prosecutor did not know that Cherie Palmer's testimony would be inadmissible in the second trial. Palmer argues, however, that there is evidence to support a finding that, although the prosecutor may not have known with certainty that the evidence was not admissible, he had a strong hunch that it would turn out to be barred, yet he

presented the evidence anyway in hopes of gaining an advantage. The advantage was that Palmer's divorce would be final on retrial and Cherie Palmer's testimony could then be admitted.[20]

Whatever the appeal of Palmer's argument, finding a violation of double jeopardy in the circumstances of this case is too great a stretch. The court is bound by the Eighth Circuit's earlier finding that no prosecutorial misconduct occurred. The circuit court affirmed the factual finding that the prosecutor did not know that Cherie Palmer's testimony would be inadmissible when it was offered. There may be a subtle distinction between concrete, certain "knowledge" and what amounts to a suspicion, but the distinction is not clear enough for this court to find that the prosecutor's "hunch" is enough on which to base an extension of the "goading to mistrial" concept. Accordingly, the court finds no double jeopardy violation on grounds of prosecutorial misconduct in Palmer's third trial.[21]

### 4. The Nebraska Death Sentencing Scheme (Claims III, IV, V, VI, VIII, XXII)

Palmer challenges the Nebraska death penalty sentencing scheme in several particulars. He first argues that the Nebraska Supreme Court's method of proportionality review violates due process and the Eighth Amendment. He further argues that his due process rights were vio-

lated when the Nebraska Supreme Court resentenced him under a different proportionality paradigm and a newly narrowed definition of "exceptional depravity," thus denying him access to Nebraska's two-tiered sentencing procedure. Palmer also argues that the reformulated definition of "exceptional depravity" that was set out in *Palmer III*, 399 N.W.2d at 728–32, did not afford him constitutional notice. Last, Palmer asserts a claim based on *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), and now, *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002), arguing that Nebraska's death penalty scheme violates his Sixth Amendment right to trial by a jury.

The question of whether a statute is constitutional is a question of law. *United States v. Prior*, 107 F.3d 654, 658 (8th Cir.1997). Under pre-AEDPA standards, this court reviews state court decisions *de novo;* under post-AEDPA standards, this court determines whether the state court decision is either contrary to or is an unreasonable application of clearly established law at the time of the decision. Under either standard, this court's findings are the same.

Under the Nebraska death penalty scheme in force at the time of Palmer's sentencing, the determination of whether the defendant should be sentenced to death or life imprisonment was made fol-

---

**20.** The fact that this was a capital case lends some credence to Palmer's theory. Palmer's evidence shows that it was likely that he would not have been sentenced to death without Cherie Palmer's testimony. Even if double jeopardy would not have barred a retrial, it would have barred a death sentence if Palmer had been sentenced to life in the second trial. *See Sattazahn v. Pennsylvania*, 537 U.S. at 106, 123 S.Ct. 732; *Arizona v. Rumsey*, 467 U.S. 203, 211, 104 S.Ct. 2305, 81 L.Ed.2d 164 (1984); *Bullington v. Missouri*, 451 U.S. 430, 445, 101 S.Ct. 1852, 68 L.Ed.2d

270 (1981). By avoiding that scenario, the prosecutor gained the advantage of being able to present Cherie Palmer's testimony in a third trial. By then, by virtue of either (1) legislative abrogation of spousal immunity, or (2) the Palmers' divorce, Cherie Palmer's testimony would be admissible.

**21.** This is not to say that the evidence was sufficient in the first and second trials to support the death penalty. *See* discussion later in this opinion in connection with Palmer's ineffectiveness of counsel claims.

lowing a sentencing hearing by the judge who presided over the trial or accepted the guilty plea, or by a three-judge sentencing panel, after a hearing. Neb.Rev.Stat. §§ 29–2520, 29–2521. Aggravating and mitigating circumstances were listed in Neb.Rev.Stat. § 29–2523. *See supra* at note 4 and note 5. The trial judge or a three-judge sentencing panel was required to fix the sentence at either life or death and to determine: (1) whether sufficient aggravating circumstances existed to justify imposition of a sentence of death; (2) whether sufficient mitigating circumstances existed which approached or exceeded the weight given to the aggravating circumstances; and (3) whether the sentence of death was excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. Neb.Rev.Stat. § 29–2522. The statute also provided for automatic review of any death sentence by the Nebraska Supreme Court. Neb.Rev.Stat. § 29–2525.

### a. Proportionality Review

In Claims III, IV, and V, Palmer asserts he was deprived of Eighth and Fourteenth Amendment rights because the Nebraska Supreme Court failed to conduct a proper proportionality review. As noted, Nebraska's death penalty scheme mandates automatic review of all cases where the death sentence is imposed. Neb.Rev.Stat. § 29–2525. Moreover, Nebraska law mandates that a proportionality review be performed at both the sentencing level and by the Supreme Court on mandatory review. Neb.Rev.Stat. §§ 29–2522(3), 29–2521.03.

The state again argues that Palmer raises only an issue of state law.[22] To the contrary, this court earlier found that Palmer raises a constitutional claim. *See* Filing No. 58, Mem. and Order at 4–5.

The underlying constitutional principle embodied in the Nebraska death penalty scheme "is, that given the life interest at stake, the death penalty shall not be imposed without due process." *State v. Reeves,* 258 Neb. 511, 604 N.W.2d 151, 163 (2000). The Nebraska Supreme Court acknowledges that a challenge to a sentence of death under the Nebraska statute involves a due process analysis. *Id.* This court is required in habeas matters to accept the state courts' interpretation of state law, but is not similarly bound as to the constitutional effect of that construction. *McIntyre v. Caspari,* 35 F.3d 338, 342 (8th Cir.1994). Although state courts have the final authority to interpret that state's legislation, this court is authorized to consider claims asserting constitutional violations. *Id.*

While the federal Constitution does not mandate a proportionality review, once one is in place it must be conducted consistently with the Due Process Clause. *Kilgore v. Bowersox,* 124 F.3d 985, 995 (8th Cir.1997) (finding no constitutional error in a comparison to similar cases). Although a mere violation of state law is not the automatic equivalent of a violation of the federal Constitution, some aspects of the sentencing process created by state law are so fundamental that the states must adhere to them in order to impose a valid sentence. *Hicks v. Oklahoma,* 447 U.S. 343, 345, 100 S.Ct. 2227, 65 L.Ed.2d 175 (1980) (involving state statute providing for trial by jury and stating that a defendant "has a substantial and legitimate expectation that he will be deprived of his liberty only to the extent determined by the jury in the exercise of its statutory discretion, and that liberty interest is one that the Fourteenth Amendment preserves

---

22. This court rejected that contention in its earlier order in this case, and characterized the state's argument in this regard as "bor-

der[ing] on the frivolous" and "absurd." See Filing No. 58, Mem. and Order at 4–5.

against arbitrary deprivation by the State"); *Chambers v. Bowersox,* 157 F.3d 560, 564 (8th Cir.1998). Nebraska's two-tiered sentencing scheme is one such fundamental aspect. *State v. Reeves,* 604 N.W.2d at 157 (recourse to the two-tier system is a liberty interest); *Rust v. Hopkins,* 984 F.2d 1486, 1492–95 (8th Cir.1993) (deprivation of meaningful appellate review under the two-tier system is a violation of due process).

■■■■ Proportionality review satisfies due process when a state court compares the defendant's case with other *similar* cases. *See Kilgore,* 124 F.3d at 986 (emphasis added). Where a state creates a right, such as a defendant's right to a review of his sentence, the Fourteenth Amendment entitles him to procedures to ensure that the right is not arbitrarily denied. *Foster v. Delo,* 39 F.3d 873, 882 (8th Cir.1994) (finding no error in conducting a relevant "reasoned" review). If this due process requirement is met, the court will look no further. *Chambers,* 157 F.3d at 570. Proportionality review has been upheld in a comparison that defined "similar" cases narrowly, in that a murder during a robbery was compared to other murders during robberies. *Hall v. Luebbers,* 296 F.3d 685, 700 (8th Cir.2002), *cert. denied* —— U.S. ——, 123 S.Ct. 1638, 155 L.Ed.2d 497 (2003). Accordingly, the court finds that Palmer had a "substantial and legitimate expectation" that the state statute requiring proportionality review that compared similar crimes at two levels would be followed. The validity of the proportionality review undertaken in Palmer's case involves two issues. First, whether the proportionality review was proper (in the sense that the comparisons were appropriate) and, second, whether Palmer received the benefit of a two-tiered review.

### i. Proper Comparison

■■■ The Nebraska statute plainly requires "the Supreme Court to review and analyze *all* criminal homicides committed under the existing law in order to insure that each case produces a result similar to that arrived at in other cases with the same or similar circumstances." Neb.Rev. Stat. § 29–2521.01 (Reissue 1985) (emphasis added). The purpose of the statute, "to compensate for the lack of uniformity in charges which are filed as a result of similar circumstances," was expressed in legislative findings incorporated into the law. Neb.Rev.Stat. § 29–2521.01. The legislature then imposed an obligation on the Supreme Court to review and analyze all criminal homicides committed after April 20, 1973. *Palmer III,* 399 N.W.2d at 746. As part of the review and analysis, the Supreme Court was to "examine (1) the facts including mitigating and aggravating circumstances, (2) the charges filed, (3) the crime for which defendant was convicted, and (4) the sentence imposed." Neb.Rev. Stat. § 29–2521.02; *Palmer III,* 399 N.W.2d at 746–47 (Krivosha, C.J., concurring in part and dissenting in part).

This court agrees with then-Chief Justice Krivosha that

> [t]he plain language of the act seems to make it clear that all criminal homicide cases are to be reported to the Supreme Court and that the Supreme Court, in conducting its review, is to look at all of these cases and to then compare the case on appeal with those other cases having *same or similar circumstances, not penalties,* to determine whether the imposition of the death penalty in the case on appeal is more severe than that imposed in other cases having same or similar circumstances.

*Id.* at 747 (emphasis added). Thus, the court finds the Nebraska Supreme Court majority erred in *Palmer III* when it ef-

fectively rewrote the statute to require comparison to other *death sentences* rather than to other *"criminal homicides"* or at least to all other *first degree murders.* Moreover, because the statute created a liberty interest and a substantial and legitimate expectation that the statute would be followed, this error is of constitutional proportions and amounts to a denial of due process.

The statute, as interpreted by the Nebraska Supreme Court in *Palmer III,* 399 N.W.2d at 733–37, cannot afford meaningful appellate review to ensure that the death penalty is not applied in an arbitrary or capricious manner. *See State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, 890 (1977) (stating, before the legislature enacted proportionality review, that, in order to satisfy the requirements of *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the Supreme Court would guarantee that the death penalty was not imposed in an arbitrary and capricious manner by comparing "each capital case under review with those previous cases in which the death penalty has or *has not* been imposed") (emphasis in original). The method of comparison adopted in *Palmer III* is illogical and renders proportionality review a nullity. *See State v. Lotter,* 255 Neb. 456, 586 N.W.2d 591, 637 (1998) (Connolly, J., concurring), *modified in nonrelevant part on rehearing,* 255 Neb. 889, 587 N.W.2d 673 (1999). Any proportionality review conducted under the criteria of *Palmer III* is meaningless. Finding a sentence of death "no greater than or disproportionate to" another sentence of death is a fallacy since a death penalty cannot be "greater than or disproportionate to" another death sentence. *Id.* at 638. Limiting proportionality review to death sentence cases is irrational and destroys the analytic value of proportionality review itself. *State v. Bey,* 137 N.J. 334, 645 A.2d 685, 690 (1994) (establishing the universe of cases as those that are death-eligible). Limiting review to cases in which the death penalty has been imposed is like looking for race discrimination in public transportation by comparing only those riding in the back of the bus. *See Palmer III,* 399 N.W.2d at 752.

Had a proportionality review been properly performed in Palmer's case, as then-Chief Justice Krivosha observed in his concurrence and dissent, the result would have been fifty-seven robbery/murders to compare to Palmer's crime, only six of which resulted in a sentence of death (10.5 percent as opposed to 89.5 percent of similar crimes that received a sentence of life). *Id.* at 752–53 (noting the similar cases "clearly exemplify that what Palmer did, while morally repugnant and deserving of the maximum punishment permitted by law, was really no different from what many others have done and for which they received a life sentence."). Thus, the finding that Palmer's death sentence was proportionate was error. The finding was not only incorrect but was an unreasonable application of Supreme Court precedent.

Accordingly, the statute, as interpreted, violates the maxim announced in *Godfrey v. Georgia,* 446 U.S. 420, 427, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980), that "the penalty of death may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner." The proportionality review is aimed at narrowing the class of capital defendants, separating those murders that warrant the extreme sanction of death from those that do not. *Id.* Comparison to other sentences of death cannot perform this function. *See* David C. Baldug et al., *Arbitrariness and Discrimination in the Administration of the Death Penalty: A Legal and Empirical Analysis of the Nebraska Experience (1973–1999),* 81 Neb. L.Rev. 486, 519 n. 105 (2002) (noting "It is

clear that the limitation of comparison cases by the sentencing courts to death cases minimizes the capacity of trial court proportionality to maintain consistency in sentencing outcomes"). The court finds that the Nebraska Supreme Court violated Palmer's due process rights when it arbitrarily applied an unconstitutional proportionality paradigm.

### ii. Two–Tiered Review

 Palmer asserts that he was denied recourse to the two-tiered system when the Nebraska Supreme Court applied a different comparison in its proportionality review than the sentencing panel had. The sentencing panel compared Zimmerman's murder to other first degree murders. On direct review, the Nebraska Supreme Court compared the murder to other cases in which the death penalty was imposed.

> [I]n some of our prior decisions we have indicated that the proportionality review in all death penalty cases is a comparison of the facts and circumstances in all first degree murder cases, whether the penalty imposed was death or life imprisonment. Upon further consideration of this question we have concluded that the review should include only those cases in which the death penalty was imposed.

*Palmer III,* 399 N.W.2d at 736.

This change in the comparison formula abrogated Palmer's right to an automatic, mandatory review of the sentencing court's proportionality analysis. The Supreme Court's reformulated proportionality analysis was not subject to any review (save by this court). Palmer had a statutory right to: (1) have the sentencing panel conduct a proportionality review, and (2) have the determination of that sentencing panel reviewed in the Nebraska Supreme Court. *See, e.g., Rust v. Hopkins,* 984 F.2d at 1493 (regarding the right to two-tiered determination of aggravating circum-

stances based on facts proved beyond a reasonable doubt). "While created by state law, these are not 'procedural right[s] of exclusively state concern,' they are liberty interests protected by the Fourteenth Amendment." *Id.* (quoting *Hicks v. Oklahoma,* 447 U.S. at 346, 100 S.Ct. 2227). Accordingly, although an appellate court can sometimes "cure" sentencing deficiencies, such is not the case with a deprivation of the two-tiered scheme. "The whole point of the two-tier sentencing procedure is that the initial determination is reviewed by an independent appellate court," a right that "would be subverted if the Nebraska Supreme Court could step in and fully perform the work of the sentencing panel." *Rust v. Hopkins,* 984 F.2d at 1493.

When the Nebraska Supreme Court resentenced Palmer using a different universe of defendants to determine proportionality than the sentencing panel had used, the Nebraska Supreme Court acted as an independent and unreviewable sentencing panel. This action deprived Palmer of a proper sentencing procedure in the trial court, an error comparable to that which led to reversals in *Rust v. Hopkins,* 984 F.2d at 1493, and *State v. Reeves,* 604 N.W.2d at 166. Palmer was deprived of the entire first tier of the sentencing procedures in Neb. Rev. Stats. §§ 29–2520, 29–2521, and 29–2522, and further deprived of the second tier of appellate review set forth in sections 29–2521.02 and 29–2521.03. *Accord Reeves,* 604 N.W.2d at 166. Accordingly, the court finds Palmer's right to due process was violated when the Nebraska Supreme Court applied a different proportionality review to Palmer's case than the sentencing panel had performed.

### iii. Appellate Resentencing

 Additionally, Palmer asserts that the failure of the Nebraska Supreme Court to conduct a proper proportionality

review amounts to impermissible "appellate resentencing" in violation of the Due Process Clause. This court agrees. As it had in *Rust*, "[t]he Nebraska Supreme Court did not merely 'review' the determinations of the sentencing panel, it effectively resentenced [the defendant] under a standard it had created that very same day." *Rust v. Hopkins*, 984 F.2d at 1493. This deprivation of meaningful appellate review is an independent violation of Palmer's constitutional rights. *Id.* When a state-created liberty interest is taken away in sentencing, the violation is far more serious than when no state law entitlement is jeopardized, or when an appellate "cure" is authorized by state law. *See id.* at 1493 (declining to apply *Clemons v. Mississippi*, 494 U.S. 738, 747, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), which authorizes an appellate court to remedy sentencing errors, to Nebraska's two-tiered system).

Supreme Court precedent requires appellate review of capital sentences to prevent unconstitutionally arbitrary and capricious infliction of the death penalty. *See Reeves v. Hopkins*, 76 F.3d 1424, 1428 (8th Cir.1996). Although there is nothing generally constitutionally objectionable in a state appellate court's finding of facts, even in the first instance (which may be necessary to assure that Eighth Amendment capital sentencing "channeling" concerns are satisfied to correct minor errors), appellate factfinding and reweighing cannot be applied to an entirely void sentencing which would require completely new fact findings. *Id.* The validity of appellate reweighing depends on state law. *Id.* at 1428–29. *See also Clemons*, 494 U.S. at 752–54, 110 S.Ct. 1441 (authorizing a state appellate court to either reweigh or conduct harmless error review without offending federal constitutional principles *if*

*state law authorizes* an appellate court to take such action). It is now clear that the Nebraska Supreme Court lacks the necessary authority under state law to resentence a defendant. *State v. Reeves*, 604 N.W.2d at 163. When the Supreme Court acts as an unreviewable sentencing panel in violation of state law, it denies a defendant's right to due process. *Id.* at 166.

The court finds that the Supreme Court's application of a different proportionality review to Palmer's case than that applied by the sentencing court also amounted to prohibited appellate resentencing in violation of state law and consequently in violation of federal due process.

### b. "Exceptional Depravity" Aggravator

#### i. Vagueness

Palmer asserts that the "exceptional depravity" prong of section 1(d) is unconstitutionally vague. When Palmer's third conviction became final on October 5, 1987,[23] certain precepts of death penalty jurisprudence were clearly established.

In *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Supreme Court found the death penalty, as applied in most states, unconstitutional. After *Furman*, if a state wished to authorize capital punishment, it would have to tailor and apply its law in a manner that would avoid the arbitrary and capricious infliction of the death penalty. *Id.* at 294–95, 92 S.Ct. 2726 (concurring opinion). The state "must channel the sentencer's discretion by 'clear and objective standards' that provide 'specific and detailed guidance,' and that 'make rationally reviewable the process for imposing a sentence of death.'" *Godfrey v. Georgia*, 446

---

**23.** The date the U.S. Supreme Court denied certiorari to Palmer's direct appeal of his conviction. *See Penry v. Lynaugh*, 492 U.S. 302, 313, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (conviction becomes final when Supreme Court denies review).

U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (citations omitted).

The Nebraska death penalty scheme, Neb.Rev.Stat. § 29–2519 *et seq.,* was amended in 1973 by adding aggravating and mitigating factors to address the concerns expressed in *Furman.* See Neb. Rev.Stat. §§ 29–2519 to 29–2546 (Reissue 1995); *Palmer III,* 399 N.W.2d at 754 (Krivosha, C.J., concurring and dissenting). The death penalty statute was again amended in 1978 to provide for a proportionality review. *Palmer III,* 399 N.W.2d at 725. The Nebraska statutory capital sentencing procedures that were in effect at the time that Palmer was convicted and sentenced were substantially similar to those enacted following *Furman.* See *State v. Gales,* 265 Neb. 598, 658 N.W.2d 604, 612 (2003).

■ The Eighth Amendment requires that state law define with reasonable specificity the circumstances in which the death penalty is to be imposed and articulate guidelines to provide a factfinder with principled means to distinguish a case in which the death penalty is appropriate from those cases in which it is not. *Maynard v. Cartwright,* 486 U.S. 356, 362–63, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988). Claims of vagueness directed at aggravating circumstances defined in capital punishment statutes are analyzed under the Eighth Amendment. Such challenges characteristically assert that the questioned provision fails adequately to inform the factfinders what they must find in order to impose the death penalty and as a result leaves them and the appellate courts with the kind of open-ended discretion

held invalid in *Furman.*[24] *Id.* at 361, 108 S.Ct. 1853. For a capital sentencing scheme to comply with the Eighth Amendment, "it must perform a narrowing function with respect to (1) the class of persons eligible for the death penalty and must also ensure (2) that capital sentencing decisions rest upon an individualized inquiry." *Gales,* 658 N.W.2d at 614 (describing eligibility phase and selection phase of capital sentencing). To be eligible for the death penalty, the defendant must be convicted of a crime for which the death penalty is a proportionate punishment. *Coker v. Georgia,* 433 U.S. 584, 592, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977). To render a defendant eligible for the death penalty in a homicide case, the trier of fact must convict the defendant of murder and find one "aggravating circumstance" (or its equivalent) at either the guilt or penalty phase. See, e.g., *Zant v. Stephens,* 462 U.S. 862, 878, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983).

■ A valid aggravating circumstance must not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder, and it must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder. *Id.* at 877, 103 S.Ct. 2733. Also, the aggravating circumstance may not be unconstitutionally vague. *Godfrey,* 446 U.S. at 428, 100 S.Ct. 1759 (invalidating the aggravator "outrageously or wantonly vile, horrible and inhuman" because "[a] person of ordinary sensibility could fairly characterize almost every murder as 'outrageously or wantonly vile, horrible and inhuman'").

**24.** This vagueness challenge, based on *Godfrey,* 446 U.S. at 428, 100 S.Ct. 1759, and *Gregg v. Georgia,* 428 U.S. 153, 198, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), "is not a 'new rule' under *Teague* and *Penry* because it is dictated by case law existing at the time [defendant's] conviction became final." See

*Newlon v. Armontrout,* 885 F.2d 1328, 1333 (8th Cir.1989). *Maynard v. Cartwright,* 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), is an application, not an expansion, of *Godfrey. Id.* Palmer is therefore entitled to the benefit of those decisions.

 A sentencing decision must also be based on the facts and circumstances of the individual and his crime. *Zant,* 462 U.S. at 879, 103 S.Ct. 2733. The Nebraska scheme thus consists of an "eligibility decision," in which there is a determination of the existence of one or more of the prescribed aggravating circumstances that render a defendant convicted of a capital crime eligible for a sentence of death, and a "selection decision," in which the sentencer determines whether a defendant eligible for the death penalty should in fact receive it, based upon an individualized determination of the character of the individual and the circumstances of the crime. *See Tuilaepa v. California,* 512 U.S. 967, 971, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994); *Gales,* 658 N.W.2d at 614.

 The Nebraska Supreme Court has interpreted Neb.Rev.Stat. § 29–2523(1)(d) as having two components, which the word "or" divides. *See State v. Moore,* 210 Neb. 457, 316 N.W.2d 33, 41 (1982) ("[a]ggravating circumstance (1)(d) ... describes in the disjunctive two separate circumstances [especially heinous and exceptionally depraved] which may operate in conjunction with or independent of one another"). The two prongs are not separate factors, however; each of the prongs simply purports to be justification for the application of the aggravating factor. *Harper v. Grammer,* 895 F.2d 473, 479 (8th Cir.1990). The validity of the "exceptional depravity" prong of the aggravator, both on its face

and as applied, is at issue in this case. Neb.Rev.Stat. § 29–2520(d)(1).

An aggravator similar to Nebraska's "exceptional depravity" prong was found unconstitutional on its face for "standardless and unchanneled imposition of death sentences in the uncontrolled discretion of a basically uninstructed jury." *Godfrey,* 446 U.S. at 429, 100 S.Ct. 1759 (involving "depravity of mind"); *see also Newlon v. Armontrout,* 885 F.2d 1328, 1333–35 (8th Cir.1989). Although a constitutionally narrowed construction can validly resolve a vagueness problem, it can do so only if the narrowed construction is actually applied. *Godfrey,* 446 U.S. at 428–33, 100 S.Ct. 1759.

The Nebraska Supreme Court had arguably narrowed the language of both prongs of § 29–2523(1)(d) in decisions that predated Palmer's trial.[25] The Nebraska Supreme Court construed the "exceptional depravity" component of section 29–2523(1)(d) to encompass acts that are "so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life" or that encompass depravity so apparent "as to obviously offend all standards of morality and intelligence." *See, e.g., State v. Harper,* 208 Neb. 568, 304 N.W.2d 663, 668 (1981); *Rust,* 250 N.W.2d 867, 874 (1977); *Simants,* 250 N.W.2d at 891. The court also noted the importance of violence directed at unresisting victims. *See State v. Holtan,* 197 Neb. 544, 250 N.W.2d 876, 880 (Neb.1977); *State v. Peery,* 199 Neb. 656,

---

**25.** Although the term "especially heinous, atrocious, and cruel" was found unconstitutionally vague in *Maynard v. Cartwright,* 486 U.S. at 363–64, 108 S.Ct. 1853, the Nebraska Supreme Court's limiting definition of the "especially heinous" prong as involving "torture" was later found to pass constitutional muster. *See Harper v. Grammer,* 895 F.2d at 479. The "especially heinous" prong had been earlier defined as "directed to the conscienceless or pitiless crime which is unneces-

sarily torturous to the victim." *State v. Simants,* 197 Neb. 549, 250 N.W.2d 881, 891 (1977). Murders involving torture, sadism, sexual abuse, or the imposition of extreme suffering would satisfy the requirements of the "heinous" prong. *State v. Rust,* 197 Neb. 528, 250 N.W.2d 867, 874 (1977) (adopting construction similar to that found in *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976)).

261 N.W.2d 95, 104–05 (1977). Additionally, the court noted that the word "exceptional" sets a capital defendant's acts apart from the usual or the norm of first degree murder cases. *Simants*, 250 N.W.2d at 891.

In the direct appeal of Palmer's third conviction, the Nebraska Supreme Court recited these definitions and adopted additional "objective factors," such as those adopted by the Arizona Supreme Court in *State v. Gretzler*, 659 P.2d at 10, to guide a sentencer's discretion. The court stated that:

> "exceptional depravity" in a murder exists when it is shown, beyond a reasonable doubt, that the following circumstances, either separately or collectively, exist in reference to a first degree murder: (1) apparent relishing of the murder by the killer; (2) infliction of gratuitous violence on the victim; (3) needless mutilation of the victim; (4) senselessness of the crime; or (5) helplessness of the victim.

*Palmer III*, 224 Neb. 282, 399 N.W.2d 706, 731–32.

Between Palmer's direct appeal and his state court post-conviction action, the Eighth Circuit found the exceptional depravity prong, as narrowed in *Palmer III*, was unconstitutionally vague on its face. *Moore v. Clarke*, 904 F.2d 1226, 1229 (8th Cir.1990) (*Moore I*) (invalidating a 1980 conviction in reliance on *Godfrey* and *Gregg*). The Eighth Circuit later denied a petition for rehearing in the Moore case, despite the Supreme Court's intervening ruling in *Walton v. Arizona*, 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990),[26] that the *Gretzler* factors adopted in *Palm-*

*er III* were a valid limiting construction. *See Moore v. Clarke*, 951 F.2d 895 (8th Cir.1991) (*Moore II*). The Eighth Circuit continued, in later cases, to refer to the "exceptional depravity" prong of the statute as unconstitutionally vague. *See, e.g., Williams v. Clarke*, 40 F.3d 1529, 1539 (8th Cir.1994). In *Joubert v. Hopkins*, 75 F.3d 1232, 1243 (8th Cir.1996), however, while expressly declining to reach the issue, the Eighth Circuit stated in dicta that the narrowed construction of "exceptional depravity" adopted in *Palmer III* was clearly constitutional. *Joubert*, 75 F.3d at 1244.

Recently, the Eighth Circuit rejected a vagueness and notice challenge to the constitutionality of the "exceptional depravity" prong as applied to a sentence of death imposed in 1995. *Moore v. Kinney*, 320 F.3d 767, 775 (8th Cir.2003) (en banc), *cert. denied*, ––– U.S. –––, 123 S.Ct. 2580, 156 L.Ed.2d 609 (June 16, 2003) (*Moore III*). In that case the court found that at the time of Moore's resentencing in 1995, the "exceptional depravity" prong of section 1(d) had been afforded a constitutionally valid narrowing construction "achieved through the requirement of a selection of victims on the basis of age." *Id.* at 773–75 (affirming application of either the *Palmer III* factors or the "cold, calculated" test to define "exceptional depravity"). Generally, a state appellate court may provide such a limiting construction. *Walton v. Arizona*, 497 U.S. at 654–55, 110 S.Ct. 3047; *Sloan v. Delo*, 54 F.3d 1371, 1384–85 (8th Cir.1995) ("A state appellate court may cure an unconstitutionally vague instruction ... by establishing and then later applying a valid limiting construction").[27]

---

**26.** *Walton* was partially overruled on other grounds by *Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002).

**27.** That principle has been called into question in the advent of *Ring*. *Valerio v. Crawford*,

306 F.3d 742, 756 n. 6 (9th Cir.2002) (en banc) (noting that it appears inescapable that *Ring* overrules appellate court factfinding under *Walton*).

The court finds the exceptional depravity prong of the statute is facially unconstitutional because it offers nothing objective as an "inherent restraint on the arbitrary and capricious infliction of the death sentence," *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759, and is not "suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action," *Gregg*, 428 U.S. at 189, 96 S.Ct. 2909. *See Moore I*, 904 F.2d at 1229 ("We agree with the district court's conclusion that the text of the statute, standing alone, is not constitutionally sufficient").[28] The question before the court is whether the sentencing bodies had the guidance necessary to cure the vaguely-worded statute at the time Palmer's conviction became final. *See id.* The court must determine whether, either at the time Palmer was sentenced in 1984 or when his conviction became final in 1987, the Supreme Court of Nebraska had construed the "exceptional depravity" language in a manner that directed and limited the discretion of the sentencing body "so as to minimize the risk of wholly arbitrary and capricious action," and provided a "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." *Gregg*, 428 U.S. at 188–89, 96 S.Ct. 2909.

The court finds that at the time Palmer was sentenced in 1984 the Nebraska Supreme Court had not sufficiently narrowed the meaning of "exceptional depravity."

*See id.* at 1232 (finding insufficient narrowing with respect to 1980 sentencing). Similarly, the "exceptional depravity" prong had not been constitutionally narrowed at the time Palmer's conviction became final in 1987. Accordingly, because there was nothing to guide the sentencing panel, the panel's application of the vague aggravator to Palmer was error.

The court further finds that the Nebraska Supreme Court erred in *Palmer III* when it applied the *Gretzler* factors to Palmer's case. Nothing in the exceptional depravity definitions that pre-dated Palmer's sentencing foreshadowed the *Gretzler* factors. In *Palmer III*, the Nebraska Supreme Court used the following cases to illustrate that the five *Gretzler* factors were present in Nebraska cases that found "exceptional depravity": *State v. Holtan*, 250 N.W.2d at 880 (involving a murder during a robbery);[29] *State v. Simants*, 250 N.W.2d at 891 (involving the sexual assault and murder of a ten-year-old girl and five members of her family; finding depravity in three out of five murders: one involving first degree sexual assault, one involving sexual molestation of an elderly victim's body after death, and one involving pubic bruising on a seven-year-old victim);[30] *State v. Peery*, 261 N.W.2d at 104 (involving murder and robbery where victim was bound, "shot once between the eyes, once in the right temple, and once when the mouth was open, the gun thrust into her

**28.** The later rehabilitation of the invalid factor applied to a 1995 resentencing and does not affect the finding that the aggravator had not been sufficiently narrowed before Palmer's conviction was final. *Cf. Moore III*, 320 F.3d at 774.

**29.** The federal district court later found the "exceptional depravity" prong was constitutionally infirm as applied in Holtan's case because of the lack of consistency in its application by the Nebraska Supreme Court. *Holtan v. Black*, CV84–L–393, slip op. at 29, 1986

WL 12479 (D.Neb. Nov. 05, 1986). *See Holtan v. Black*, 838 F.2d 984, 985 n. 1, 986 (8th Cir.1988) (remanding issue as not ripe for review).

**30.** The death penalty affirmed in *State v. Simants*, 250 N.W.2d at 881, was later vacated in *Simants v. State*, 202 Neb. 828, 277 N.W.2d 217 (1979). Simants was tried again, found insane, and committed to a mental institution. *State v. Simants*, 248 Neb. 581, 537 N.W.2d 346 (1995).

mouth, and a bullet was fired into the roof of the mouth directly into the brain," noting evidence of torture in firing gun into mouth if it were the first shot and "an attack on the body after death" if it were not); *State v. Otey*, 205 Neb. 90, 287 N.W.2d 36 (1979) (involving a finding of torture, sadism, sexual abuse, and the imposition of extreme suffering in infliction of over fifteen stab wounds to victim pleading for mercy); *State v. Harper*, 304 N.W.2d at 668 (involving slow and agonizing deaths by poisoning with a carcinogen; murders were also premeditated, coldly planned in advance and calculated); [31] *State v. Moore*, 316 N.W.2d at 41 (involving murders of cab drivers found to be coldly planned as part of robberies and repetitive, where victims were chosen on the basis of age); and *State v. Reeves*, 216 Neb. 206, 344 N.W.2d 433, 447 (1984) (involving brutal double murders and stabbings; the 1(d) aggravator was found to apply to the murder that involved "horrible sexual abuse and the imposition of extreme suffering," but not to the murder that did not involve sexual assault, where death occurred swiftly and suddenly).[32]

The court is unable to see the connection between these cases and the factors set forth in *Gretzler*. Although *Peery* and *Holtan* involve robbery/murders, the facts of the Zimmerman murder equally resemble the facts in cases that pre-dated the sentencing in which application of the section 1(d) factor was rejected. *See State v. Rust*, 250 N.W.2d at 874 (holding "exceptional depravity" aggravator did not exist where bank robber repeatedly shot helpless civilian who was assisting police); *State v. Stewart*, 197 Neb. 497, 250 N.W.2d 849 (1977) (holding "exceptional depravity" aggravator did not apply to defendant, who came "prepared to defend himself" with a gun, shot van driver at point blank range in the back of the head, shot second victim in the eye, and afterwards set fire to the van in order to cover up the murder and shooting).[33]

Moreover, even if the *Gretzler* factors are valid, the facts of Palmer's case do not support their application. On direct appeal, the court found the evidence supported application of the "helplessness" factor and the "infliction of gratuitous violence" factor. *Palmer III*, 399 N.W.2d at 732. The Nebraska Supreme Court characterized *the murder itself* as the infliction of gratuitous violence, since the physical abuse of the victim was not necessary to complete the robbery. *Id.* (emphasis added).

As noted in the discussion on the "exceptional depravity" aggravator, an aggravator is intended to narrow the class of murderers, creating a subclass of murderers who deserve the death penalty. The

---

**31.** Harper's sentence was affirmed based on the "heinousness" prong, not the "exceptional depravity" prong of Neb.Rev.Stat. § 29–2523(1)(d). *Harper v. Grammer*, 895 F.2d 473, 478 (8th Cir.1990) (noting "even as limited and defined by this court, the 'exceptional depravity' language of the second prong of aggravating circumstance (1)(d), has failed to pass constitutional muster in the federal courts").

**32.** Reeves's sentence of death was ultimately reversed because the Nebraska Supreme Court's resentencing, without a remand to the sentencing panel for determination of the existence of the mitigating factor of intoxication, violated Reeves's due process rights. *State v. Reeves*, 604 N.W.2d at 168.

**33.** Also, the facts more closely resemble the crimes in cases that Palmer presented to the sentencing panel in support of the proportionality review. Each of those defendants had been charged and convicted of first degree murder and sentenced to life imprisonment or a term of years. *See* Ex. 62 (Schaeffer); Exs. 63–65 (Roewert); Exs. 66–68 (Floyd); Exs. 70–72 (Thorton); Ex. 73 (Lynch); and Ex. 74 (Jones).

Nebraska Supreme Court's method would instead narrow the class of murderers, creating a subclass of robber/murderers. Robber/murderers are felony murderers, but the death penalty cannot be imposed on every felony murderer; the class must be narrowed since capital crimes must reflect a consciousness materially more "depraved" than that of any person guilty of murder. *Godfrey*, 446 U.S. at 443, 100 S.Ct. 1759. "In order for aggravating circumstance (1)(d) to be present, the method of killing must entail something more than the ordinary circumstances which attend any death-dealing violence." *State v. Hunt*, 220 Neb. 707, 371 N.W.2d 708, 721 (1985). Even the description of "infliction of gratuitous violence" in *Gretzler* itself does not fit the facts of Zimmerman's murder. Noting the presence of the factor in another case, the court stated that the

> defendant shot the female victim twice in the chest, dragged her into the bedroom, and then shot her four more times in the head for no apparent reason. He shot the male victim three times, and after his victim had fallen, shot him once more in the back. He then began kicking the male victim in the face repeatedly, at a time when the victim was already unconscious or dead.

*Gretzler*, 659 P.2d at 11. The court finds the evidence adduced at Palmer's third trial does not support a finding of infliction of gratuitous violence, separate and apart from the violence attendant to the murder by strangulation.

 Helplessness as an aggravator ordinarily applies to the victim's *status* as helpless (*i.e.*, age, infirmity, limited mental capacity, etc.), not to the fact of tying a victim up. *See, e.g., Arizona v. Zaragoza*, 135 Ariz. 63, 659 P.2d 22, 28 (1983) (finding that advanced age and limited mental capacities demonstrate helplessness). Also, the "helplessness" factor alone, without consideration of other circumstances pres-

ent in a particular case, will not compel a finding of heinousness or depravity. *Gretzler*, 659 P.2d at 11. Notably, the medical examiner testified that he found no evidence in this case that the victim's hands had been bound. Moreover, whatever the validity of the *Gretzler* factors, they were not applied by the sentencing panel in the first instance.

Although the Nebraska Supreme Court also found the Zimmerman murder "heinous," the evidence does not support that finding, as construed to mean torture. *See State v. Rust*, 250 N.W.2d at 874. Zimmerman's physical injuries (a collapsed wind pipe and head injuries) were connected to the strangulation and assault. Such injuries cannot be said to equate to torture.

#### ii. Lack of Notice

 Palmer further asserts that the Nebraska Supreme Court's post hoc construction of the aggravator deprived him of constitutional notice. The Nebraska Supreme Court's "reformulation" of the aggravator occurred in his own direct appeal. *See Palmer III*, 399 N.W.2d at 728–29.

At the time Palmer was tried, convicted and sentenced, "exceptional depravity" had been defined to mean that either: (1) the victims were helpless or unresisting, *Holtan*, 250 N.W.2d at 880; (2) the act itself was "so coldly calculated as to indicate a state of mind totally and senselessly bereft of regard for human life," *Rust*, 250 N.W.2d at 874; or (3) the depravity is so apparent "as to obviously offend all standards of morality and intelligence," *Simants*, 250 N.W.2d at 891. As noted earlier, Eugene Zimmerman's murder does not meet those criteria. Under those definitions, the available constructions could not have alerted Palmer to the conduct that would implicate a death sentence. A defendant's right to notice and to fair warning of the conduct that impacts upon his liberty is a basic principle long recognized

by the Supreme Court. *Bouie v. City of Columbia*, 378 U.S. 347, 350–51, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964); *In re Oliver*, 333 U.S. 257, 273, 68 S.Ct. 499, 92 L.Ed. 682 (1948). Palmer's due process rights were first violated when he was deprived of advance notice of the factors that would make him eligible for the death penalty, and were later violated by the Nebraska Supreme Court's post hoc application of its newly-defined "exceptional depravity" aggravator to his case.

In some circumstances, a reviewing court can salvage a facially-vague aggravator by construing it to provide the sentencing body with objective criteria for applying the statute. *See Walton*, 497 U.S. at 653–54, 110 S.Ct. 3047; *Godfrey*, 446 U.S. at 428, 100 S.Ct. 1759. The problem here is that the sentencing body was never provided with the definition of the narrowed aggravator. The sentencing body, unlike the three-judge panel in the 1995 resentencing of Carey Dean Moore in *Moore III*, was never given an opportunity to apply the reviewing court's construction. *Cf. Moore III*, 320 F.3d at 776. The adversarial process was complete when the Nebraska Supreme Court decided the criteria on which it would rely to determine whether Palmer would be sentenced to death.

A post hoc sentencing scheme such as this denies defendants due process in the most basic sense, for they have no prior notice of the law to be used against them. *Accord, Osborne v. Ohio*, 495 U.S. 103, 115, 110 S.Ct. 1691, 109 L.Ed.2d 98 (1990) (holding new construction of statute may be applied to conduct occurring prior to construction only where defendant has fair warning of new application); *Marks v. United States*, 430 U.S. 188, 191, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (same). In this case, the aggravator was construed and narrowed after a full presentation of the evidence and without any notice to the defendant as to the standards to be applied in making the decision on imposition of the death penalty. The failure to first clearly set out the construction of the aggravator and the subsequent failure to advise the defendant of that construction is contrary to clearly established Supreme Court precedent, specifically, *Bouie*, 378 U.S. at 350–54, 84 S.Ct. 1697 (1964). *Bouie* makes it clear that the Fourteenth Amendment is violated when a person is required to speculate as to the application of a statute. *Id.*

*Moore III* does not alter this analysis. *Moore III* involved a resentencing in 1995. The requisite notice to Moore of the narrowed definition of "exceptional depravity" had been provided by the factors set out in *Palmer III*, along with the language of the statute, pre-*Palmer* constructions, the definition set out in *Joubert*, 75 F.3d 1232, 1243, the definition found in the earlier *Moore* case, *State v. Moore*, 316 N.W.2d at 41 (regarding selection on basis of age), and Supreme Court affirmance of the *Gretzler* factors. *Moore III*, 320 F.3d at 776, 778 (noting Moore had "ample notice in 1994 and 1995 that the state planned to pursue a narrowed definition of 'exceptional depravity' which would include the notion that Moore selected his victims on the basis of their ages"). Palmer had no such notice, since the "coldly calculated" definition did not fit the fact pattern in Palmer's case and the *Palmer III* (*Gretzler*) factors had not been elucidated until his own appeal. The fact patterns identified by the Supreme Court to justify post hoc imposition of the *Gretzler* factors simply do not support application of the "inflicted gratuitous violence" and "helplessness of the victim" factors to Palmer. *See* discussion in section II(B)(4)(b)(i). Any infliction of gratuitous violence in those cases was much more severe than that involved in the Zimmerman murder and generally involved torture, sadism, sexual abuse, or abuse of the body after death.

### iii. Two–Tiered System

Palmer again asserts the Nebraska Supreme Court's application of a different definition of exceptional depravity to the facts of his case than that applied by the sentencing panel denies him of his liberty interest in a two-tiered review and amounts to improper appellate resentencing. The court finds that application of a reformulated aggravator by the Nebraska Supreme Court violated Palmer's due process rights for the same reasons as application of a reformulated proportionality paradigm did. *See* discussion in section II(B)(4)(a)(ii).

### iv. Appellate Reweighing

In a state where the sentencer weighs aggravating and mitigating circumstances, the weighing of an invalid aggravating circumstance violates the Eighth Amendment. *Espinosa v. Florida*, 505 U.S. 1079, 1081, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992). Nebraska is a weighing state. *Williams v. Clarke*, 40 F.3d at 1535. The sentencing panel's reliance on the unconstitutionally vague "exceptional depravity" prong makes Palmer's death sentence infirm. *Stringer v. Black*, 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (using invalid aggravator in weighing state amounts to impermissible thumb on death's scale). An aggravating circumstance is invalid if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor. *Id.* at 235, 112 S.Ct. 1130. "[I]f a weighing state decides to place capital-sentencing authority in two actors rather than one, neither actor must be permitted to weigh invalid aggravating circumstances." *Espinosa*, 505 U.S. at 1082, 112 S.Ct. 2926.

The court finds that the Nebraska Supreme Court's application of an invalid aggravator to Palmer on direct review violates the Eighth Amendment. Moreover, any reweighing by the state post-conviction court in *Palmer IV* cannot cure the infirmity. *See Reeves*, 604 N.W.2d at 163.

### 5. Jury Finding of Aggravator (Claim XIII)

#### a. Applicability/Retroactivity of Ring

In *Ring v. Arizona*, 536 U.S. at 589, 122 S.Ct. 2428, the Supreme Court held that criminal defendants have a Sixth Amendment right to a jury determination of any fact that increases their maximum punishment. The court must determine whether the *Ring* decision should be retroactively applied to this habeas corpus action. Notably, Palmer has preserved this issue; he has raised it throughout these proceedings.[34] *See, e.g.*, St. Ct. File, Vol. IV at 629, motion for jury trial on sentencing (April 12, 1984); *Palmer III*, 399 N.W.2d at 724–25 (addressing issue on direct appeal). District and appellate courts are allowed to decide the retroactive applicability of a new rule of constitutional law announced by the Supreme Court in reviewing an initial petition. *See United States v. Mora*, 293 F.3d 1213, 1218 (10th Cir.), *cert. denied*, 537 U.S. 961, 123 S.Ct. 388, 154 L.Ed.2d 315 (2002); *Ashley v. United States*, 266 F.3d 671, 673 (7th Cir. 2001); *United States v. Lopez*, 248 F.3d 427, 431 (5th Cir.2001); *United States v. Sanders*, 247 F.3d 139, 146 n. 4 (4th Cir.), *cert denied*, 534 U.S. 1032, 122 S.Ct. 573, 151 L.Ed.2d 445 (2001) (all holding that 28 U.S.C. § 2244(b)(3)(C), which requires a retroactivity determination to be made by the Supreme Court itself, does not apply to initial petitions).[35] *Accord, United States*

---

**34.** The state has not raised any procedural bar defense to the *Apprendi/Ring* claim. *See* Filing No. 58 at 2.

**35.** Similarly, the Eighth Circuit's recent declaration that *Ring* is not retroactive applies only to a second or successive petition and

v. *Moss,* 252 F.3d 993, 997–1001 (8th Cir. 2001) (addressing and rejecting the argument that *Apprendi* is a watershed rule of constitutional procedure that may be applied to habeas petitions, an issue that has not been resolved by the Supreme Court).

■ New rules of substantive criminal law are presumptively retroactive. *See Santana–Madera v. United States,* 260 F.3d 133, 138 (2d Cir.2001), *cert. denied,* 534 U.S. 1083, 122 S.Ct. 817, 151 L.Ed.2d 701 (2002). As a general rule, "new constitutional rules of criminal *procedure* will not be applicable to those cases which have become final before the new rules are announced." *Teague v. Lane,* 489 U.S. at 288, 310, 109 S.Ct. 1060 (1989) (emphasis added). Courts employ a three-step inquiry to determine when new rules of criminal procedure apply retroactively on collateral review. *O'Dell v. Netherland,* 521 U.S. 151, 156, 117 S.Ct. 1969, 138 L.Ed.2d 351 (1997). First, the court must determine the date on which the defendant's conviction became final. *Id.* Second, the court must decide whether the Supreme Court's ruling constitutes a new rule of constitutional criminal procedure; *Teague* is inapplicable unless the court finds both that the rule is new and that it involves a procedural rather than a substantive change. *Bousley v. United States,* 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).[36] Third, a new procedural rule may nonetheless apply if it falls within one of two narrow exceptions to *Teague's* general rule barring retroactivity.[37] *See Unit-*

*ed States v. Sanders,* 247 F.3d 139, 148 (4th Cir.2001).

There is no dispute that Palmer's conviction became final well before the Supreme Court's *Ring* decision was announced in 2002. Similarly, it cannot be seriously disputed that *Ring* announces a new rule. To determine "newness," courts are directed to "survey the legal landscape as it then existed," and to determine whether a court considering a petitioner's claim at the time his conviction became final "would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution." *Lambrix v. Singletary,* 520 U.S. 518, 526, 117 S.Ct. 1517, 137 L.Ed.2d 771 (1997). Prior to *Ring,* precedent instructed that the finding of aggravating facts fell within the traditional scope of capital sentencing and could legitimately be made by a judge instead of a jury. *See Jones v. United States,* 526 U.S. 227, 251, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999). Whether viewed as a threshold question obviating the need for a *Teague* inquiry, or as the second step in a *Teague* analysis, the determination of *Ring's* retroactivity largely turns on whether *Ring* establishes a substantive or procedural rule. *See, e.g., Summerlin v. Stewart,* 341 F.3d 1082 (9th Cir.2003) (en banc); *Santana–Madera v. United States,* 260 F.3d at 137–38 ("[w]hether or not a new rule of law announced by the Supreme Court is to be applied retroactively in criminal cases on habeas review for the first time depends largely on whether the rule is substantive or procedural"). Un-

---

does not apply to this case. *See Moore III,* 320 F.3d at 771, n. 3.

**36.** Some courts regard this as a threshold inquiry, finding that *Teague* only comes into play where the new rule is procedural rather than substantive. *See United States v. Barajas–Diaz,* 313 F.3d 1242, 1245 (10th Cir. 2002). Other courts conflate the inquiry with the first *Teague* exception.

**37.** These are: (1) if a new procedural rule places an entire category of primary conduct beyond the reach of the criminal law; or (2) if it is a "watershed rule of criminal procedure" that is necessary to the fundamental fairness of the criminal proceeding. *Teague,* 489 U.S. at 310–16, 109 S.Ct. 1060.

like strictly procedural rules, new rules of substantive criminal law are presumptively retroactive. *Bousley v. U.S.,* 523 U.S. 614, 620, 118 S.Ct. 1604, 140 L.Ed.2d 828 (1998).

The substantive/procedural question, in turn, depends on an analysis of just what "new rule" can be gleaned from *Ring.* If *Ring* stands only for the proposition that every element of a crime must be submitted to a jury, as an extension of *Apprendi v. New Jersey,* 530 U.S. at 490, 120 S.Ct. 2348, then it could be characterized as a procedural rule which should be analyzed under *Teague* standards. *See, e.g., Sanders,* 247 F.3d at 147 (stating that "*Apprendi* constitutes a procedural rule because it dictates what fact-finding procedure must be employed to ensure a fair trial"). If, on the other hand, *Ring* is read as refining the definition of a capital offense, then it is a substantive decision. *See Jones,* 526 U.S. at 251 n. 11, 119 S.Ct. 1215 (noting constitutional concerns inherent in judicial determination of facts that "raise a sentencing ceiling"); *Davis v. United States,* 417 U.S. 333, 346–47, 94 S.Ct. 2298, 41 L.Ed.2d 109 (1974) (holding that a defendant may collaterally attack a conviction based on an intervening substantive change in the interpretation of a federal criminal statute).

■ Substantive rules determine the meaning of criminal statutes. *Bousley,* 523 U.S. at 620, 118 S.Ct. 1604 (holding that a finding that effectively alters the elements of a crime is a substantive rule). Decisions announcing substantive rules often address the criminal significance of certain facts or of the underlying prohibited conduct. *Curtis v. United States,* 294 F.3d 841, 843 (7th Cir.2002), *cert. denied,* 537 U.S. 976, 123 S.Ct. 451, 154 L.Ed.2d 334 (2002). The appropriate inquiry in determining whether a rule is substantive is whether the claimed error amounts to a " 'fundamental defect which inherently re-sults in a complete miscarriage of justice,' and whether '[i]t present[s] exceptional circumstances where the need for the remedy afforded by the writ of habeas corpus is apparent.' " *Davis,* 417 U.S. at 345, 94 S.Ct. 2298 (quoting *Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)). If a conviction and/or sentence is "for an act that the law does not make criminal," collateral relief is justified and retroactive application of a new rule is cognizable. *Id.*

■ The importance of the distinction between substance and procedure in the habeas context is rooted in concern for the principal function of habeas corpus relief— to assure that no man has been incarcerated under a procedure that creates an impermissibly large risk that an innocent man will be convicted. *Bousley,* 523 U.S. at 620, 118 S.Ct. 1604. Thus, a new substantive rule is announced when the Supreme Court decides that a criminal statute does not reach, i.e., prohibit, certain conduct. *Id.* Because such decisions change the definition of what constitutes a "crime," they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal.' " *Id.* (quoting *Davis,* 417 U.S. at 346, 94 S.Ct. 2298); *see also Sattazahn v. Pennsylvania,* 537 U.S. at 112, 123 S.Ct. 732 (noting that " 'murder plus one or more aggravating circumstances' is a separate offense from 'murder' *simpliciter* ") (plurality opinion) (emphasis in original). To mitigate this risk, new substantive rules must be applied retroactively on habeas review. *Bousley,* 523 U.S. at 619–21, 118 S.Ct. 1604.

■ In contrast, procedural decisions set forth fact-finding procedures to ensure a fair trial. *Sanders,* 247 F.3d at 147. When the Court announces a new procedural rule, it may alter significant aspects of criminal proceedings, but rarely influ-

ences "the accurate determination of innocence or guilt." *Teague,* 489 U.S. at 313, 109 S.Ct. 1060. In most instances, then, "there is no reason to apply [a procedural] rule retroactively on habeas review." *Bousley,* 523 U.S. at 620, 118 S.Ct. 1604.

■ The court finds the *Ring* decision announces a substantive rule of criminal law and must be accorded retroactive effect. *See Bousley,* 523 U.S. at 620, 118 S.Ct. 1604 (finding *Teague* inapplicable to a decision interpreting the reach of a weapon statute). The court finds *Ring* is closely analogous to the substantive new rules announced in *Richardson v. United States,* 526 U.S. 813, 821, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999) (finding that "series of violations" language in continuing criminal enterprise statute creates several *elements* and requiring jury unanimity with respect to each violation), *Bailey v. United States,* 516 U.S. 137, 142, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (articulating the substantive elements that the government must prove to convict a person charged with "use" of a firearm and explaining what conduct is, and has always been, criminalized by the statute); and *Jones v. United States,* 529 U.S. at 850, 120 S.Ct. 1904 (interpreting "used in interstate commerce" as an element of the federal crime of arson, and holding the statute did not reach arson of an owner-occupied dwelling).

The holdings in each of these cases have been held to be retroactively applicable on collateral review. *See Bousley,* 523 U.S. at 620, 118 S.Ct. 1604 (involving *Bailey* ); *United States v. Barajas-Diaz,* 313 F.3d 1242, 1245 (10th Cir.2002); *United States v. Brown,* 305 F.3d 304, 308 (5th Cir.2002), *cert. denied,* —— U.S. ——, 123 S.Ct. 1919, 155 L.Ed.2d 840 (2003); *Ross v. United States,* 289 F.3d 677, 681 (11th Cir.2002) *cert. denied,* 537 U.S. 1113, 123 S.Ct. 944, 154 L.Ed.2d 787 (2003); *Santana-Madera v. United States,* 260 F.3d at 138-39;

*United States v. Lopez,* 248 F.3d 427, 432 (5th Cir.2001); *Lanier v. United States,* 220 F.3d 833, 838 (7th Cir.2000); *Murr v. United States,* 200 F.3d 895, 906 (6th Cir. 2000) (all involving *Richardson* ); *United States v. Ryan,* 227 F.3d 1058, 1062–63 (8th Cir.2000) (involving *Jones* ).

The Supreme Court's holding in *Ring* altered the elements of the crime of capital murder. *Ring,* 536 U.S. at 608, 122 S.Ct. 2428 (noting that aggravating factors operate as the functional equivalent of an element of a greater offense). Viewing an aggravator as an element of the crime creates two categories of offenses: capital murder in which an aggravator is proved to a jury beyond a reasonable doubt, which can result in a sentence of death; and capital murder in which an aggravator is not proved to a jury beyond a reasonable doubt, which can only result in life imprisonment. This latter category creates a class of defendants against whom a certain category of punishment, death, is now prohibited. *See, e.g., Sattazahn,* 537 U.S. at 111–12, 123 S.Ct. 732. The *Ring* decision alters the elements of capital murder, thus placing certain conduct (murder absent a jury finding of an aggravator) beyond the power of law-making authorities to punish with death. *Id.* (finding capital murder a separate offense with separate elements).

The distinction between actual innocence and innocence of the death penalty is of crucial significance to this analysis. *See Sawyer v. Whitley,* 505 U.S. 333, 349–50, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992); *Schlup v. Delo,* 513 U.S. 298, 326, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The concept of "innocence of the death penalty," as distinct from innocence of the underlying crime, focuses on the elements that make a defendant eligible for the death penalty. *Sawyer,* 505 U.S. at 349–50, 112 S.Ct. 2514; *Schlup,* 513 U.S. at 326, 115 S.Ct. 851. Thus, a death row petitioner can be

innocent of the death penalty entirely independent of whether he is innocent of the underlying capital offense. *See Sawyer,* 505 U.S. at 342–43, 112 S.Ct. 2514. To show actual innocence of the death penalty, a capital defendant must show that no aggravating circumstance existed or that some other condition of death penalty eligibility has not been met. *Lingar v. Bowersox,* 176 F.3d 453, 461 (8th Cir.1999).

The Supreme Court's holding in *Bousley* centers on the notion of actual innocence and reflects concern with the "impermissibly large risk that the innocent will be convicted." *Bousley,* 523 U.S. at 620, 118 S.Ct. 1604. "Much turns on the determination that a fact is an element of an offense rather than a sentencing consideration, given that elements must be charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." *Jones v. United States,* 526 U.S. at 232, 119 S.Ct. 1215 (holding that a provision of the carjacking statute calling for higher penalties in cases involving bodily injury was an additional element of the offense rather than a sentencing consideration). Thus, in a death penalty case, the essential distinction between eligibility for imposition of the ultimate sanction of death and noneligibility makes *Ring* a substantive rather than procedural ruling.

Cases holding that the Supreme Court's holding in *Apprendi,* 530 U.S. at 475, 120 S.Ct. 2348, on which *Ring* was premised, may appear to cloud this analysis, but that is not the case. First, most cases holding that *Apprendi* is not retroactive deal with second or successive petitions and rely on the fact that the Supreme Court has not expressly declared *Apprendi* retroactive. *See, e.g., Forbes v. United States,* 262 F.3d 143, 146 (2d Cir.2001) (per curiam) (holding that *Apprendi* has not been made retroactive to cases on collateral review by the Supreme Court); *In re Clemmons,* 259 F.3d 489, 493 (6th Cir.2001) (holding *Apprendi* does not apply retroactively to second or successive § 2255 motions). Cases holding that *Apprendi* cannot be retroactively applied to initial petitions are based on the notion that "[a]lthough the *Apprendi* rule is important as a means of clarifying the proper factfinding roles of judge and jury, it affords an innocent defendant no additional shield from wrongful conviction." *Sepulveda v. United States,* 330 F.3d 55, 61 (1st Cir.2003). *See also Coleman v. United States,* 329 F.3d 77, 84 (2d Cir.2003) ("[t]he holding of *Apprendi* dictates only who must decide certain factual disputes and under what standard of proof they must be decided … [i]t does not determine which facts are 'elements' of a crime nor refer to any substantive norms"); *Goode v. United States,* 305 F.3d 378, 385 (6th Cir.), *cert. denied,* 537 U.S. 1096, 123 S.Ct. 711, 154 L.Ed.2d 647 (2002) (noting the rule "merely limits the potential penalty to be imposed on [an undoubtedly] guilty defendant"); *Curtis v. United States,* 294 F.3d at 843 (noting "*Apprendi* is about nothing but procedure—who decides a given question (judge versus jury) and under what standard (preponderance versus reasonable doubt)" and does not alter "which facts have what legal significance, let alone suggest that conspiring to distribute marijuana is no longer a federal crime" absent a jury finding of a certain quantity). In contrast, the *Ring* decision, in light of the crucial innocent of crime/innocent of death distinction in a death penalty case, shields an "innocent of death" defendant from wrongful conviction of a *capital* crime, alters the legal significance of facts and determines which facts are elements of the capital crime. Clearly, the rationale for *Apprendi's* nonretroactivity does not translate to a finding that *Ring* is not retroactive. *See Summerlin,* 341 F.3d at 1101 n. 9.

*Ring* is all about substance. The Supreme Court explains that it has "interpreted the Constitution to require the addition of an element or elements to the definition of a criminal offense in order to narrow its scope." *Ring*, 536 U.S. at 606, 122 S.Ct. 2428. Moreover, in the area of capital punishment, unlike other areas, the Supreme Court has " 'imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment—we have restricted the legislature's ability to define crimes.' " *Id.* (quoting *Apprendi*, 530 U.S. at 522–23, 120 S.Ct. 2348 (Thomas, J., concurring)). The court also rejected a procedural efficiency rationale for judicial factfinding in capital cases, stating, "[t]he Sixth Amendment jury trial right, however, does not turn on the relative rationality, fairness, or efficiency of potential factfinders." *Ring*, 536 U.S. at 607, 122 S.Ct. 2428.

This language indicates that *Ring* announces a new rule of substantive criminal law that must be retroactively applied to Palmer in this habeas corpus case. Under the principle announced in *Ring*, Palmer's death sentence is constitutionally infirm. The Nebraska death penalty scheme, like the Arizona scheme at issue in *Ring*, exposes Palmer to a greater punishment than that authorized by the jury's guilty verdict upon a judicial determination that an aggravating circumstance exists. *See id.* at 604, 122 S.Ct. 2428. Palmer has been denied his Sixth Amendment right to have a jury determine that aggravating circumstances exist with respect to his crime, and thus to establish the existence of the element of the crime that would make him culpable of a capital offense.

### 5. Felony–Murder (Claims XIV and XV)

▮ Palmer was charged and convicted of first degree felony murder under Neb. Rev.Stat. § 28–303 for killing during the course of a robbery. He contends that his sentence of death is constitutionally infirm because there is no finding of requisite intent and the jury should have been instructed on lesser-included offenses.

Under Nebraska law, a person commits first degree murder if he "kills another person (1) purposely and with deliberate and premeditated malice or (2) in the perpetration or attempt to perpetrate any sexual assault in the first degree, arson, robbery, kidnapping. . . ." Neb.Rev.Stat. § 28–303. First degree murder is punishable by either life imprisonment or by death. Neb.Rev.Stat. § 28–105(1). The record shows that in the third trial, the court instructed the jury on the elements of felony murder as follows:

Criminal intent is a material fact and necessary element of the crime of First Degree Murder as charged against the defendant. But the intent required is not an intent to kill Eugene William Zimmerman but is an intent to deprive him of money or personal property of value.

Instruction No. 7, St. Ct. File, Vol. IV at 764. The court did not instruct the jury on any additional or specific showing of intent needed to impose the death penalty. In argument, however, the jury was made aware that Zimmerman's murder was a capital offense. Trial III Tr., Vol. IV at 819, 830, 832. In response to Palmer's claims in connection with the Nebraska felony murder statute, the state post-conviction court stated only that "a person may be convicted of first degree murder under a felony murder theory without violating his Eighth or Fourteenth Amendment rights." *Palmer IV*, 600 N.W.2d at 769.

It was well established at the time of Palmer's sentencing that the death penalty cannot be imposed on a defendant without a showing of some culpability *with respect to the killing itself. Enmund v. Florida,*

458 U.S. 782, 801, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982). In 1984, it was also established that a jury could not be presented with an all-or-nothing choice between death or acquittal. *See Beck v. Alabama*, 447 U.S. 625, 638–42, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) (holding that in a capital case due process requires that a jury be given the option of convicting the defendant on a lesser included noncapital offense if the evidence would support conviction on that offense to avoid presenting juries with a "death or nothing" choice between conviction of a capital crime and finding the defendant not guilty).

Subsequent to Palmer's sentencing and direct appeal, the Supreme Court held that the culpable mind-state for imposition of the death penalty in a felony murder case is reckless indifference to the value of human life. *Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (holding that before a state can impose the death penalty, there must be a showing of *both* major participation in the killing and reckless indifference to human life). Thus, a finding of reckless indifference will satisfy *Enmund's* intent requirement; under *Enmund*, a federal habeas court "must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made." *Cabana v. Bullock*, 474 U.S. 376, 387, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986) (noting *Enmund* holds that the principles of proportionality embodied in the Eighth Amendment bar imposition of the death penalty upon a class of persons who may be guilty of the crime of capital murder as defined by state law but did not "themselves kill, attempt to kill, or intend to kill"); *Johns v. Bowersox*, 203 F.3d 538, 543 (8th Cir.2000). *Enmund* and *Tison* provide an independent constitutional requirement of the mental culpability a state must prove if it is to impose a death sentence. *Hopkins v. Reeves*, 524 U.S. 88, 100, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). *Tison* and *Enmund* do not affect the showing that a state must make at a defendant's trial for felony murder, so long as the requirement is satisfied at some point thereafter. *See id.* (a state could comply with *Enmund's* requirement at sentencing or even on appeal).

Under Nebraska law, felony murder differs from other murders because it requires no showing of any intent to kill. *State v. Reeves*, 344 N.W.2d at 442. ("The turpitude involved in the [underlying felony] takes the place of intent to kill or premeditated malice, and the purpose to kill is conclusively presumed from the criminal intention required for [the underlying felony].") The state relies on this principle to support its imposition of the death penalty on Palmer. *See* Respondent's Merits Brief at 55. Thus, the state argues that the finding that Palmer intended to commit the underlying felony (robbery) takes the place of any showing that Palmer intended to kill. The state's position may be correct with respect to a conviction for first degree murder under a felony murder theory, but it is incorrect and unreasonable with respect to a *capital* conviction for first degree felony murder.

There has been no finding of any culpable mind-state at any stage of proceedings in this case. A jury finding of guilt of felony murder does not equate to a finding of intent. *Cabana*, 474 U.S. at 383, 106 S.Ct. 689. Similarly, the sentencing panel's findings do not amount to a finding of the requisite intent. The sentencing panel made the wholly unsupported and incorrect statement that the jury had found Palmer's actions were willful and deliberate. To the contrary, the jury made no such finding. Under the instructions, the jury found only intent to commit the rob-

bery. The sentencing panel made no independent findings on Palmer's mental state.

In fact, the evidence adduced at the third trial would hardly support a finding of deliberate intent to kill. There is a failure of proof on the entire mind-state issue. The evidence surely shows intent to commit the robbery, but without transfer of that intent to the murder, proof is lacking. The Constitution plainly requires an intent to kill in order for the state to impose the ultimate sanction of death. *Enmund*, 458 U.S. at 801, 102 S.Ct. 3368. The only evidence that relates to Palmer's subjective intent is the fact of the murder. No one witnessed the killing. No one knows what went on in the upstairs room. The sentencing panel relied only on evidence that thumps and gurgling sounds were heard. Although death by struggle and strangulation may almost be assumed to translate to intent to kill, no factfinder has been charged with making that determination.

This finding is supported by the Supreme Court's analysis in *Ring*, 536 U.S. at 594, 122 S.Ct. 2428, *Ring* also involved a murder in the course of a robbery. *Id.* at 593, 122 S.Ct. 2428. The jury was instructed on both premeditated murder and felony murder, and returned a verdict of guilty on the felony murder count. *Id.* at 591, 122 S.Ct. 2428. The evidence admitted at the guilt phase of the trial failed to prove that Ring actually committed the murder. *Id.* Thus, under Arizona law, Ring could not be sentenced to death unless further findings were made. *Id.* at 592, 122 S.Ct. 2428. At a sentencing hearing, Ring's codefendant, who had entered into a plea agreement, testified that Ring was the perpetrator of the murder. *Id.* The sentencing judge thus made the determination that Ring exhibited reckless indifference to the value of human life. *Id.* at 593, 122 S.Ct. 2428.

Pre-*Ring*, the Supreme Court stated, " '[o]ur ruling in *Enmund* does not concern the guilt or innocence of the defendant—it establishes no new elements of the crime of murder that must be found by the jury' and 'does not affect the state's definition of any substantive offense.' " *Hopkins v. Reeves*, 524 U.S. at 100, 118 S.Ct. 1895 (quoting *Cabana*, 474 U.S. at 385, 106 S.Ct. 689). That is no longer the case, in light of the Supreme Court's finding that an aggravating circumstance that makes a defendant eligible for the death penalty is the functional equivalent of an element of a greater offense. *See, e.g., Sattazahn*, 537 U.S. at 111, 123 S.Ct. 732 (stating "for purposes of the Sixth Amendment's jury-trial guarantee, the underlying offense of 'murder' is a distinct, lesser-included offense of 'murder plus one or more aggravating circumstances' "). Whereas murder exposes a defendant to a maximum penalty of life imprisonment, murder plus an aggravator increases the maximum permissible sentence to death. *See id.*

Similarly, while felony murder exposes a defendant to life imprisonment, felony murder plus a finding of the requisite intent to kill exposes a defendant to the death penalty. *See, e.g., Ring*, 536 U.S. at 601–02, 122 S.Ct. 2428. *Ring's* rationale is as applicable to the element of a certain culpable mind-state that increases a penalty as it is to a statutory aggravator that increases a penalty. Thus, the correct focus under this analysis is whether a factfinder has made findings of the requisite intent. This issue is central because "murder plus 'one or more aggravating circumstances' is a separate offense from 'murder' simpliciter." *Sattazahn*, 537 U.S. at 112, 123 S.Ct. 732 (finding that an "acquittal" of an aggravator will bar retrial of death penalty eligibility under double jeopardy). Correspondingly, "first degree murder" under Nebraska law—the offense

of which Palmer was convicted during the guilt phase of his proceedings—is properly understood to be a lesser included offense of both first-degree-murder-plus-an-aggravating-circumstance or first-degree-felony-murder-plus-the-required-intent. *See id.* Accordingly, absent a finding of the requisite intent, the evidence is not sufficient to support a sentence of *capital* murder. This amounts to an acquittal of death eligibility.

### 6. Ineffective Assistance of Counsel (Claims XVI, XVII, XX, and XXI)

Palmer asserts ineffective assistance of counsel in four particulars. He asserts: (1) that counsel was ineffective in the sentencing phase of his first trial because counsel failed to object to the use of Cherie Palmer's statement at the sentencing hearing; (2) counsel was ineffective in the direct appeal of his first trial by failing to raise and argue the improper admission of Cherie Palmer's statement in the sentencing phase of his first trial; (3) counsel was ineffective in the sentencing phase of his first trial for conceding the existence of aggravator 1(b) of Neb.Rev.Stat. § 29-2523 (killing to conceal one's identity); and (4) counsel was ineffective in the sentencing phase of his third trial in by failing to conduct any investigation into existence of mitigators and failing to interview Cherie Palmer before the sentencing.

■■ In a federal habeas challenge to a state criminal judgment, a state court conclusion that counsel rendered effective assistance is not a finding of fact binding on the federal court to the extent stated by 28 U.S.C. § 2254(d); rather, it is a mixed question of law and fact. *Strickland v. Washington,* 466 U.S. 668, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Thus, a federal court may grant relief when the state court adjudication of the claim resulted in a decision that was contrary to, or involves an unreasonable application of, clearly established federal law. *Wiggins v. Smith,* — U.S. ——, ——, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003). A "federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced.'" *Id.* (quoting *Lockyer v. Andrade,* 538 U.S. 63, ——, 123 S.Ct. 1166, 1175, 155 L.Ed.2d 144 (2003)).

■■ The Supreme Court established the legal principles that govern claims of ineffective assistance of counsel in *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052, and the rule set forth in *Strickland* qualifies as "clearly established Federal law, as determined by the Supreme Court of the United States." *Williams v. Taylor,* 529 U.S. at 390, 120 S.Ct. 1495. The standards announced in *Strickland* were clearly established law at the time Palmer's conviction became final. *Wiggins,* — U.S. at ——, 123 S.Ct. at 2535–36. A criminal defendant is entitled to effective assistance of counsel at his trial and at his appeal of right. *Strickland,* 466 U.S. at 687–88, 104 S.Ct. 2052; *Evitts v. Lucey,* 469 U.S. 387, 396, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985). The Sixth Amendment's requirement of effective assistance of counsel applies to a capital sentencing proceeding in the same manner in which it applies to the conviction phase of a criminal proceeding. *Strickland,* 466 U.S. at 669, 104 S.Ct. 2052.

An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense. *Id.* To establish deficient performance, a petitioner must demonstrate that counsel's representation "fell below an objective standard of reasonableness." *Id.* There are no articulated specific guidelines for appropriate attorney conduct. *Wiggins,* — U.S. ——, ——, 123 S.Ct. at 2535. " 'The proper measure of attorney per-

formance remains simply reasonableness under prevailing professional norms.'" *Id.* (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052).

For counsel's inadequate performance to constitute a Sixth Amendment violation, a petitioner must also show that counsel's failures prejudiced his defense. *Id.* "'To establish prejudice, a defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Id.* 123 S.Ct. at 2542 (quoting *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Id.* In certain circumstances, the requisite showing of prejudice may be presumed due to the nature of the deficient performance. *See Strickland,* 466 U.S. at 692, 104 S.Ct. 2052; *United States v. Cronic,* 466 U.S. 648, 656–58, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) (elaborating, in companion case to *Strickland,* on the presumptive prejudice concept). For the most part, courts have presumed prejudice only where the defendant establishes a constructive denial of counsel, a type of trial error that justifies a finding of presumptive prejudice, or a structural defect. *McGurk v. Stenberg,* 163 F.3d 470, 474 (8th Cir.1998).

▆▆▆ The court finds that counsel's concession of the 1(b) aggravator at the first trial is both objectively unreasonable and prejudicial to Palmer. Although a stipulation to an aggravator can be appropriate in some cases, *see, e.g., Hooker v. Mullin,* 293 F.3d 1232, 1245 (10th Cir.2002) (finding concession of prior felony aggravator a reasonable strategic tactic since jury would have found aggravator anyway), this is not such a case. The evidence does not support a finding of that aggravator absent counsel's concession. The only evidence that shows that the killing was undertaken with the purpose of concealing Palmer's

identity is that Zimmerman knew and could identify Palmer. Imposition of this factor cannot be justified simply by the fact that the murder rendered the victim incapable of identifying the perpetrator, because all murders have that result. *State v. Hunt,* 371 N.W.2d at 720–21. This would be the case with every one-on-one robbery/murder, assault/murder, rape/murder, etc., and would elevate most felony murders to capital offenses. An aggravator is meant to narrow and define the class of death-eligible murders, not to broaden that category to include most felony murders. Cases that have affirmed use of the 1(b) aggravator have involved concrete evidence, such as a confession or a statement by the killer, that his intent in committing the murder was to cover up the crime or to conceal his identity. See, e.g., *Joubert v. Hopkins,* 75 F.3d 1232 (8th Cir.1996); *State v. Otey,* 287 N.W.2d at 39.

Concession of the aggravator, in the face of limited evidence to support its application, amounts to a constructive denial of counsel that justifies a presumption of prejudice. *See United States v. Cronic,* 466 U.S. at 665, 104 S.Ct. 2039 (noting "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable"). In the present case, counsel's concession of the 1(b) aggravator amounted to a failure to subject the prosecution's capital eligibility case to any meaningful adversarial testing, making the adversary process itself presumptively unreliable. *See id.* at 658, 104 S.Ct. 2039. This is a structural defect.

▆▆▆ Counsel has a duty to conduct reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. *Wiggins,* —— U.S. at ——, 123 S.Ct. at 2534. In an

ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments. *Id.* A troubled history is relevant to assessing a defendant's moral culpability. *Id.* at 2531; *see also Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (stating the "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background ... maybe less culpable than defendants who have no such excuse") (citations omitted); *Eddings v. Oklahoma,* 455 U.S. 104, 112, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (noting that consideration of the offender's life history is a part of the process of inflicting the penalty of death).

 The court has no difficulty finding that counsel's admitted failure in the first trial to investigate any statutory or non-statutory mitigating factors fell below an objective level of reasonableness. *See Wiggins,* —— U.S. at ——, 123 S.Ct. at 2535 (outlining minimum standards of the profession); *Williams v. Taylor,* 529 U.S. at 396, 120 S.Ct. 1495 (finding a failure to uncover and present mitigating evidence at sentencing could not be justified as a tactical decision). Similarly, the record shows that counsel's investigation in the third trial was meager, nearly nonexistent. His attempts to present mitigating evidence were *pro forma* at best and were summarily rejected by the three-judge panel.

Having found deficient performance in counsel's failure to investigate, the court must determine whether the deficient performance prejudiced Palmer's defense.

Since the alleged ineffective assistance of counsel occurred during the sentencing phase, this court considers whether there is a reasonable probability that, absent the errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. *Wiggins,* 123 S.Ct. at 2542. In assessing prejudice, the court reweighs the evidence in aggravation against the totality of available mitigating evidence. *Id.* at 2543.

Given the weakness of the legal and factual underpinnings of both aggravators, the court finds that there is a reasonable probability that the result would have been different if the factfinder had been adequately presented with any additional evidence in mitigation. There is evidence that with a proper investigation, counsel could have discovered additional evidence of Palmer's troubled and difficult childhood. *See, e.g.,* Ex. 75 (deposition of Palmer's sister showing Palmer's placement in a residential facility at age eighteen months and outlining physical abuse by stepfather). Counsel's failure to do any investigation and his acquiescence to the information contained in the presentence investigation report is a serious deficiency.[38] The court finds a reasonable probability that additional evidence in mitigation would have influenced the sentencing panel's appraisal of Palmer's moral culpability. That reasonable probability undermines the court's confidence in the outcome with respect to the sentence of death.

The court finds Palmer is thus entitled to habeas corpus relief for ineffective assistance of counsel in the penalty phases of both his first trial and his third trial.

---

**38.** Although Cherie Palmer's statement in the presentence investigation report could most likely be considered in sentencing, the problem is counsel's failure to produce any evidence to rebut her statements or to attack her credibility. Significantly, counsel additionally failed to present any evidence that was in any way favorable to Palmer.

### 7. Lack of a Speedy Trial (Claim X)

■ The Sixth Amendment guarantees the right to a speedy trial. U.S. Const. amend. VI; *Barker v. Wingo,* 407 U.S. 514, 515, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Palmer asserts that the seventeen-week span between the reversal of his second conviction on September 9, 1983, and the commencement of his third trial on March 5, 1984, violates this right.

Courts use a four-part balancing test to determine whether an accused has been denied the right to a speedy trial under the Sixth Amendment. The factors to be considered in each case are: (1) the length of delay; (2) the reason for the delay; (3) the assertion of the right to speedy trial by the accused; and (4) the prejudice to the accused resulting from the delay. *Id.* at 530, 92 S.Ct. 2182. No single factor is dispositive because all four must be weighed against the others to determine whether a defendant has been denied his rights to a speedy trial. *Id.* at 533, 92 S.Ct. 2182. The first factor, the length of delay, serves as a triggering device. *United States v. Richards,* 707 F.2d 995, 997 (8th Cir.1983). Unless there is some delay that is presumptively prejudicial, an inquiry into the other factors is unnecessary. *Id.* (finding a delay of thirty-five months presumptively prejudicial).

The court is unable to find that the seventeen-week delay in this case is presumptively prejudicial. Accordingly, the court finds this claim is without merit.

### 8. Unconstitutional Pretrial Photo Display (Claim XI)

■ Palmer contends that a pretrial photo display that was shown to Mrs. Zimmerman for identification was impermissibly suggestive because all of the individuals were shown standing next to a door frame, making Palmer, at the height of six feet, seven inches, stand out.

■ Courts use a five-point totality of circumstances test to determine reliability of an identification. *Neil v. Biggers,* 409 U.S. 188, 199–200, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). The factors include: (1) the opportunity of the witness to view the perpetrator at the time of the crime; (2) the degree of attention of the witness; (3) the accuracy of prior descriptions given by the witness; (4) the level of the witness's certainty demonstrated at the later confrontation; and (5) the length of time between the crime and the confrontation. *Id.*

Mrs. Zimmerman testified that she observed Palmer in her home on several occasions. Mrs. Zimmerman's description included the approximate age and height of Palmer. She quickly identified Palmer from the photograph and was positive about the identification. Under the totality of the circumstances, Mrs. Zimmerman's identification of Palmer was not unreliable as a matter of law. In addition, there is enough other evidence and testimony that lead to Palmer's identification. Although Palmer was indeed taller than the others in the lineup, the court finds the photo display was not so striking or distinctive as to be impermissibly suggestive or to give rise to a substantial likelihood of irreparable misidentification. Therefore, the court finds this claim lacks merit.

### 9. Wrongful Admission of Hypnotically–Induced Testimony (Claims XII and XIII)

■ Palmer contends that after the reversal of his first conviction because of erroneous admission of hypnotically-induced evidence, the hypnotically-induced recollections continued to taint the evidence in his later trials.

The Nebraska courts found error in the trial court's admission of hypnotically induced testimony in the first trial as a matter of state law. *Palmer I,* 313

N.W.2d at 653–54. The admissibility of evidence at trial is generally a matter of state law. *Clark v. Groose,* 16 F.3d 960 (8th Cir.1994); *see also Weston v. Dormire,* 272 F.3d 1109, 1112 (8th Cir.2001) (admission of polygraph evidence in a state court trial is a matter of state law). For purposes of habeas review under 28 U.S.C. § 2254, therefore, the court considers only the question of whether the state trial court's ruling rendered his trial fundamentally unfair. *Id.*

In the second and third trials, Monica Zimmerman's testimony was limited to statements she had made prior to the hypnosis, and Deanna Klintworth's identification testimony was barred altogether. The differences in the testimony before and after the "suggestive" hypnosis sessions are not that significant. For example, Monica Zimmerman thought Palmer was six feet two inches instead of six feet seven inches. Counsel was allowed to cross-examine on the effects of the hypnosis and presented evidence of its unreliability. The significance of the testimony of these witnesses pales in comparison to the damning evidence presented by Cherie Palmer.

The court therefore finds that, whatever the effect of hypnotically-induced recollections, the trial was not fundamentally unfair in this respect.

### 10. Illegal Arrest and Seizure (Claim XIX)

Palmer asserts that his warrantless arrest and seizure in Austin, Texas, violates the Fourth Amendment. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," and further provides that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. Probable cause to arrest exists at the moment when the facts and circumstances within an officer's knowledge, of which he

has reasonably trustworthy information, are sufficient to warrant a reasonable man to believe that an offense has been or is being committed. *Crane v. State,* 786 S.W.2d 338, 346 (Tex.Crim.App.1990).

In the present case, there is no dispute that the officers had probable cause to arrest Palmer. The crucial issue is whether the police should first have obtained a warrant. Texas law authorizes an arrest without a warrant under certain circumstances. Tex.Code Crim. Proc. Ann. arts. 14.01–14.04. When a felony has been committed and the offender is about to escape, so that there is no time to procure a warrant, a peace officer may, without warrant, pursue and arrest the accused. *Id.*

Under the circumstances in this case, the police officers clearly had probable cause to arrest the defendant. The officers knew the coin dealer was meeting the defendant at the Austin airport, where they reasonably believed that there was the possibility of defendant's immediate flight. The evidence shows that they did not have time to secure a warrant. The court finds a valid, warrantless arrest was made under the governing law. *Id.* The court finds that Palmer's contention that he was arrested in violation of the Fourth Amendment lacks merit.

### 11. Death by Electrocution (Claim XVIII)

The court has determined that this claim is not yet ripe for resolution. Filing No. 58 at 8–9. In the interest of completeness, however, the court will briefly address the issue. Palmer was allowed to supplement the record on this claim. *See* Filing No. 62. Palmer has presented evidence from medical and scientific experts, electrocution witnesses, prison officials, coroner reports, protocols for Nebraska executions, and postmortem photographs of the three persons executed

in Nebraska since 1972 (Willie Otey, John Joubert, and Robert Williams). *See* Filing No. 75, Jan. 24, 2002, Evidentiary Hearing Exs. 3–6, 8–21, 22A–D, 23–27. The court has reviewed his evidence. If this court were to reach the issue, it would find that Palmer's evidence shows that death by electrocution violates the Eighth Amendment's proscription against cruel and unusual punishment.

Protocols show that the present Nebraska electrocution procedure calls for application of 2450 volts of electricity for eight seconds, followed by application of 480 volts for twenty-two seconds, followed by a twenty-second pause, followed by a second application of 2450 volts for eight seconds and 480 volts for twenty-two seconds. Ex. 1 at 2, Ex. 5 at 3. Scientific expert testimony does not establish any scientific or medical reason for this procedure. Indeed, the purposeful twenty-second delay between applications of the current potentially allows the inmate to regain consciousness. Ex. 27 at 48–50; Ex. 25 at 62.

Coroner reports show that John Joubert suffered a four-inch blistering burn on the top of his head and blistering on both sides of his head above his ears. Ex. 17 at 1. Robert Williams had a "bubble blister" the size of a baseball on his left calf. Ex. 12 at 15–16. Williams's postmortem exam also showed pronounced "charring" on both sides of the knee and on the top of the head. Ex. 19 at 2. An execution witness reported seeing smoke emanating from Williams's knee and head. Ex. 20. at 6. Witnesses observed that Harold "Willie" Otey was still breathing after the first and second applications of electricity. Ex. 26 at 53. Expert medical testimony establishes that "charring" burns are fourth-degree burns, due to severity. Ex. 24 at 18. Burns on other parts of the inmate's body can be caused by arcing due to the saline solution dripping from spots where electrodes are attached to the inmate's

skin. Ex. 24 at 23. Such burns are not necessary to cause death. *Id.* at 25.

Expert testimony provides no evidence that electrocution produces instantaneous unconsciousness. *Id.* Scientific expert testimony shows that there is no way to know what voltage is being delivered to the person being executed unless there is a voltage meter on the person. Ex. 24 at 25–31. The amount of current being delivered depends on the resistivity of human tissue; each type of tissue conducts electricity differently. *Id.* at 19–25. The skull shields the brain from electricity; certain evidence indicates that less than one-tenth of the current used in an electrocution goes to the brain. *See* Ex. 25 at 38; Ex. 26 at 48. Other expert testimony shows that merely because an inmate's heart stops beating does not mean he or she has lost consciousness. *See id.* The pause in application of the current is likely more painful than a continuous jolt would be. Ex. 26 at 19. Moreover, autopsy examinations of persons executed in other jurisdictions show virtually no damage to the brain, thus indicating that the brain is likely not wholly incapacitated during a judicial execution. Ex. 26 at 46–47.

The Eighth Amendment provides that "excessive bail shall not be required, nor excessive fines imposed, nor Cruel and Unusual Punishment inflicted." U.S. Const. amend. VIII. Under the Eighth Amendment, unnecessary pain and suffering must be minimized when imposing the death penalty. *Wilkerson v. Utah,* 99 U.S. 130, 136, 25 L.Ed. 345 (1878); *Louisiana ex rel. Francis v. Resweber,* 329 U.S. 459, 67 S.Ct. 374, 91 L.Ed. 422 (1947) (reaffirming the notion that there should be no unnecessary pain in a death penalty sentence). "Evolving standards of decency" must be considered when defining the Eighth Amendment's Cruel and Unusual Punishment Clause. *See Robinson v. Cal-*

*ifornia,* 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (holding that all Eighth Amendment claims must be evaluated "in the light of contemporary human knowledge"). The best evidence of these evolving standards " 'is the legislation enacted by the country's legislatures.' " *Atkins v. Virginia,* 536 U.S. 304, 312, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (quoting *Penry v. Lynaugh,* 492 U.S. at 331, 109 S.Ct. 2934); *see also Stanford v. Kentucky,* 492 U.S. 361, 370, 109 S.Ct. 2969, 106 L.Ed.2d 306 (1989) (" '[f]irst' among the 'objective indicia that reflect the public attitude toward a given sanction' are statutes passed by society's elected representatives") (citations omitted).

"A penalty must also accord with 'the dignity of man,' which is the 'basic concept underlying the Eighth Amendment.' " *Gregg,* 428 U.S. at 173, 96 S.Ct. 2909 (joint opinion of Stewart, Powell, and Stevens, JJ.). Accordingly, courts recognize "that painless, post mortem punishments such as public display, drawing and quartering, and mutilation also violate the Eighth Amendment." *Campbell v. Wood,* 511 U.S. 1119, 114 S.Ct. 2125, 128 L.Ed.2d 682 (1994) (Mem.) (Blackmun, J., dissenting from denial of application for stay of execution and petition for a writ of certiorari).

In light of the evidence and "evolving standards of decency," the court would find that a death penalty sentence imposed on a defendant in a state that provides electrocution as its only method of execution is an unnecessary and wanton infliction of pain. The evidence establishes that execution by electrocution is both cruel and unusual. The court would find that the medical, scientific, and photographic evidence shows that death by electrocution is neither quick nor painless. Nebraska's procedure has the potential to increase the perception of conscious pain. The photographic and documentary evidence shows the procedure is barbaric. The evidence

graphically illustrates the concerns of Justice Brennan that "death by electrical current is extremely violent and inflicts pain and indignities far beyond the 'mere extinguishment of life.' " *Glass v. Louisiana,* 471 U.S. 1080, 1087, 105 S.Ct. 2159, 85 L.Ed.2d 514 (1985) (Brennan, J., dissenting from denial of certiorari).

Nebraska is now the only state that authorizes death by electrocution as its only form of execution. However humane electrocution may once have seemed in comparison to earlier methods, such as hanging, the guillotine, or drawing and quartering, that is no longer the case. *See, e.g., Campbell,* 511 U.S. at 1119, 114 S.Ct. 2125 (regarding hanging). The states' rejection of electrocution in favor of lethal injection is now all but universal. "If the Eighth Amendment represents anything other than a prohibition against punishments that have been entirely abolished, a punishment once universally practiced and then abandoned specifically due to its inhumanity must qualify as cruel and unusual." *Id.*

The Cruel and Unusual Clause is given an "expansive and vital character." *Weems v. United States,* 217 U.S. 349, 372, 30 S.Ct. 544, 54 L.Ed. 793 (1910). Because it draws its meaning from the evolving standards of decency that mark the progress of a maturing society, it is time for courts to consider through "discriminating evaluation" whether a type of execution is "barbaric" and unnecessary in light of the different alternatives. *Furman,* 408 U.S. at 430, 92 S.Ct. 2726 (Powell, J., dissenting).

Therefore, the court makes the factual finding that the evidence shows that electrocution is barbaric and unnecessary, and would find death by electrocution to violate the Eighth Amendment's proscription against cruel and unusual punishment.

## III. Conclusion

The finality and severity of a death sentence make it qualitatively different from all other forms of punishment. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality opinion). The Supreme Court has stressed the great need for reliability in capital cases, requiring that "capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Strickland v. Washington*, 466 U.S. at 704, 104 S.Ct. 2052 (Brennan, J., concurring in part and dissenting in part). "[H]abeas corpus is, at its core, an equitable remedy." *Schlup v. Delo*, 513 U.S. at 319, 115 S.Ct. 851. Because of the equitable nature of the writ, a federal court "has broad discretion in conditioning a judgment granting habeas relief [and is] authorized . . . to dispose of habeas corpus matters 'as law and justice require.'" *Hilton v. Braunskill*, 481 U.S. 770, 775, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987).

The court finds that Palmer has been sentenced to death for capital murder in violation of the United States Constitution. Specifically, the court finds that Palmer's sentence of death is invalid by reason of errors that amount to a violation of Palmer's due process rights and rights guaranteed by the Sixth and Eighth Amendments. These errors cannot be cured by appellate reweighing or harmless error review. *See* discussion *supra* at sections II(B)(4)(a)(ii) & (iii); (B)(4)(b)(iii) & (iv); (B)(6). The numerous errors in the sentencing phases of Palmer's three trials compel a finding that amounts to an "acquittal" of the death penalty for Palmer. The evidence essentially shows a failure of proof on the existence of additional facts, i.e., aggravators and intent, to justify the sentence of death. Palmer cannot be resentenced to death. *See Sattazahn*, 537 U.S. at 108, 123 S.Ct. 732. This court's finding that Palmer was validly convicted of first degree murder during the guilt phase of his trials, but that the state failed to charge and prove the aggravating circumstances and requisite intent, "operate[s] as an acquittal of the greater offense—which would bar [Nebraska] from retrying [Palmer] on the greater offense (and thus, from seeking the death penalty) on retrial." *Id.*

In view of the circumstances and the length of time that Palmer has been on death row, the court finds his sentence should be commuted to life imprisonment.

Accordingly,

IT IS ORDERED:

1. The petitioner's petition for a writ of habeas corpus is granted.

2. The petitioner's sentence of death is vacated.

3. The respondent shall either release the petitioner within ninety days of the date of this order, or commute the petitioner's sentence to life in prison.